**SEALED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Civ. Case No. _____

FILED BY_____ *KP* ___D.C.

*Mar 3, 2025*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

---

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

CLICK PROFIT, LLC, a Florida limited
liability company, also doing business as
FBALaunch, PortfolioLaunch, Elevated
Ventures, and Automation Industries,

SA AUTOMATION ENTERPRISE LLC, a
Delaware limited liability company, also doing
business as Click Profit, FBALaunch, and
PortfolioLaunch,

M23 HOLDINGS, LLC, a Delaware limited
liability company, also doing business as Click
Profit, FBALaunch, and PortfolioLaunch,

CLICK PROFIT DISTRIBUTION, LLC, a
Delaware limited liability company, also doing
business as Click Profit, FBALaunch,
PortfolioLaunch, and Automation Industries,

AUTOMATION INDUSTRIES LLC, a Florida
limited liability company, also doing business
as Click Profit, FBALaunch, and
PortfolioLaunch,

M7 INVESTMENTS LLC, a Massachusetts
limited liability company, also doing business
as Click Profit, FBALaunch, and
PortfolioLaunch,

EXPRESS ECOM LLC, a Delaware limited
liability company, also doing business as Click
Profit, FBALaunch, and PortfolioLaunch,

**FILED UNDER SEAL**

ECOM DIRECT LLC, a Wyoming limited
liability company, also doing business as Click
Profit, FBALaunch, and PortfolioLaunch,

CRAIG EMSLIE, individually and as an
officer, director, or owner of CLICK PROFIT,
LLC, SA AUTOMATION ENTERPRISE
LLC, and EXPRESS ECOM LLC,

PATRICK MCGEOGHEAN, individually and
as an officer, director, or owner of CLICK
PROFIT, LLC, M23 HOLDINGS, LLC and
M7 INVESTMENTS LLC,

JASON MASRI, individually and as an officer,
director, or owner of AUTOMATION
INDUSTRIES LLC and CLICK PROFIT
DISTRIBUTION, LLC, and

WILLIAM HOLTON, individually and as an
officer, director, or owner of CLICK PROFIT,
LLC, EXPRESS ECOM LLC, and ECOM
DIRECT LLC,

Defendants.

**PLAINTIFF'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER,
ASSET FREEZE, APPOINTMENT OF TEMPORARY RECEIVER, AND OTHER
EQUITABLE RELIEF, AND AN ORDER TO SHOW CAUSE,
AND ACCOMPANYING MEMORANDUM OF LAW IN SUPPORT**

Plaintiff Federal Trade Commission ("FTC") respectfully moves the Court, pursuant to

Federal Rule of Civil Procedure 65, Sections 13(b) and 19(a)(1) of the FTC Act, 15 U.S.C.

§§ 53(b), 57b, and the All Writs Act, 28 U.S.C. § 1651, for an *ex parte* Temporary Restraining

Order with an Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief,

and an Order to Show Cause Why A Preliminary Injunction Should Not Issue. In support of its

Motion, the FTC submits an accompanying memorandum of law and exhibits, and the

contemporaneously filed Rule 65 Declaration of Counsel and Application for Appointment of

Receiver.

Dated:   03/03/2025

Respectfully submitted,

Lisa W. Bohl (Special Bar No. A5503281)
James Davis (Special Bar No. A5502004)
Federal Trade Commission
Midwest Region
230 S. Dearborn Street, Suite 3030
Chicago, IL 60604
(312) 960-5624
lbohl1@ftc.gov
jdavis@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................... 1

BACKGROUND ............................................................................................................................. 2

    I.    Defendants' Unlawful Business Opportunity Scheme ........................................... 2

        A.    Overview of Click Profit's Scam ............................................................. 2

        B.    Click Profit's False and Unsubstantiated Earnings Claims ......................... 3

        C.    Click Profit's False Affiliation and AI Claims ........................................... 11

        D.    Click Profit's Suppression of Negative Reviews ..................................... 13

    II.    The Defendants ............................................................................................... 15

        A.    The Individual Defendants ....................................................................... 15

        B.    The Corporate Defendants ...................................................................... 17

ARGUMENT .................................................................................................................................. 19

    I.    The FTC Act Authorizes the Court to Grant a Temporary Restraining Order and the Requested Relief ........................................................................ 19

    II.    The FTC Meets the Standard for Preliminary Injunctive Relief .......................... 20

        A.    The FTC Is Likely to Succeed on the Merits ........................................... 20

            1.    Defendants Are Violating the FTC Act (Counts I-III) ................. 21

                a.    Defendants Make Material Misrepresentations about the Click Profit Business Opportunity (Counts I and II) ................................................................. 21

                b.    Defendants Use Manipulation, Intimidation, and Threats to Block Negative Reviews (Count III) .............. 23

            2.    Defendants Are Violating the Business Opportunity Rule (Counts IV-VII) ...................................................................... 24

                a.    Defendants Misrepresent Consumers' Earnings (Count IV) ....................................................................... 25

b.   Defendants Make Unsubstantiated Earnings Claims and Fail to Provide Disclosures (Count VI) ........................................................... 25

c.   Defendants Fail to Provide the Written Disclosure Document (Count V) ..................................... 26

d.   Defendants Make Unsubstantiated Earnings Claims in the General Media (Count VII) ....................... 26

3.   Defendants Are Violating the Consumer Review Fairness Act (Count VIII) ............................................... 27

4.   Defendants Are Violating the Impersonation Rule (Count IX) ........................................................... 27

5.   The Corporate Entities Are a Common Enterprise ...................... 28

6.   The Individual Defendants Are Personally Liable........................ 29

B.   The Equities Tip in the FTC's Favor.......................................... 31

III.   The Proposed *Ex Parte* TRO Is Appropriate and Necessary to Prevent Ongoing Harm and Preserve Final Relief................................. 31

A.   The Court Should Stop Defendants' Ongoing Scam and Order an Asset Freeze, Receivership, and Turnover of Business Records ...................................................................... 32

B.   The TRO Should Be Issued *Ex Parte* ....................................... 33

CONCLUSION.......................................................................................................34

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Akridge v. Alfa Mut. Ins. Co.*, 1 F.4th 1271 (11th Cir. 2021) ........................................... 33

*All-Tag Corp. v. Checkpoint Sys., Inc.*, 408 F. Supp. 3d 1347 (S.D. Fla. 2019) ........................... 33

*AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309 (11th Cir. 2004) .......................... 33, 34

*FTC v. Am. Vehicle Prot. Corp.*, No. 22-CV-60298, 2022 WL 14638465
   (S.D. Fla. Oct. 25, 2022) ......................................................................................... 19

*FTC v. Ascend Capventures Inc.*, No. 24-cv-7660 (C.D. Cal. Sept. 13, 2024) ............................. 32

*FTC v. Atlantex Assocs.*, No. 87-0045-CIV, 1987 WL 20384
   (S.D. Fla. Nov. 25, 1987) ......................................................................................... 29

*FTC v. Automators LLC*, No. 23-cv-1444 (S.D. Cal. Aug. 11, 2023) ......................................... 32

*FTC v. AWS, LLC*, No. 18-cv-0442 (D. Nev. Mar. 14, 2018) ................................................. 32

*FTC v. Cardiff*, No. ED-CV-18-2104, 2020 WL 6540509 (C.D. Cal. Oct. 9, 2020) ................... 23

*FTC v. Digital Income Sys., Inc.*, No. 20-24721-CV, 2020 WL 7481548
   (S.D. Fla. Dec. 1, 2020) ........................................................................................... 31

*FTC v. Ecom Genie Consulting LLC*, No. 1:24-cv-23976
   (S.D. Fla. Oct. 21, 2024) .......................................................................................... 32

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) ................................................. 29, 32

*FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014) .......................................... 20, 32

*FTC v. Kroger Co.*, No. 3:24-CV-00347, 2024 WL 5053016
   (D. Or. Dec. 10, 2024) ............................................................................................. 20

*FTC v. Lanier L., LLC*, 715 F. App'x 970 (11th Cir. 2017) ............................................... 28

*FTC v. Life Mgmt. Servs. of Orange Cnty., LLC*, 350 F. Supp. 3d 1246
   (M.D. Fla. 2018) , .................................................................................................... 28

*FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167(N.D. Ga. 2008) .......................... 21, 30

*FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066 (11th Cir. 2021) .............................. 19, 21, 32

*FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356
   (S.D. Fla. 2016) ............................................................................................. 22, 29, 30

*FTC v. Peyroux*, 723 F. Supp. 3d 1209 (N.D. Ga. 2024) ............................................................. 21

*FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257 (S.D. Fla. 2019)...................................... 28

*FTC v. Pukke*, 53 F.4th 80 (4th Cir. 2022) ................................................................................... 33

*FTC v. RivX Automation Corp.*, No. 1:24-cv-23152 (S.D. Fla. Aug. 21, 2024) ........................... 31

*FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375 (M.D. Fla. 2018) ................................................. 23

*FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346 (S.D. Fla. 2019)...................... 22, 31, 32

*FTC v. Simple Health Plans, LLC*, 792 F. App'x 761, 762 (11th Cir. 2020) ............................... 19

*FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1330 (11th Cir. 2023) .................. 20, 31, 32, 33

*FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999).................................................. 22

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003) ........................................................................ 21

*FTC v. TheFBAMachine*, No. 24-cv-6635 (D.N.J. June 3, 2024)................................................. 32

*FTC* v. *Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007).................. 21, 22, 29, 30

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991).................................................... 20, 31

*FTC v. USA Beverages, Inc.*, No. 05-61682 CIV, 2005 WL 5654219
(S.D. Fla. Dec. 6, 2005) ............................................................................................................ 20

*FTC v. Wolf*, No. 94-8119-CIV, 1996 WL 812940 (S.D. Fla. Jan. 31, 1996) .............................. 28

*FTC v. World Pat. Mktg., Inc.*, No. 17-CV-20848, 2017 WL 3508639
(S.D. Fla. Aug. 16, 2017)............................................................................................... 23, 24, 32

*FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234 (11th Cir. 2017) ..................................... 19, 28

*FTC v. Zaappaaz, LLC.*, No. 4:20-CV-2717, 2023 WL 5020618 (S.D. Tex. June 9, 2023)......... 22

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982 (11th Cir. 1995)........................... 21

*Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*, No. 3:23-CV-00046,
2023 WL 2299570 (E.D. Tenn. Feb. 28, 2023).......................................................................... 27

*Washington v. Alderwood Surgical Ctr., LLC*, 730 F. Supp. 3d 1130
(W.D. Wash. 2024)..................................................................................................................... 27

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ..................................................................................... 20

**Statutes and Regulations**

Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.* ........................................ 19, 20, 21, 23, 31

    15 U.S.C. § 45 ......................................................................................................... 21, 23

    15 U.S.C. § 53 ......................................................................................................... 19, 31

    15 U.S.C. § 57b ................................................................................................... 19, 20, 31

Consumer Review Fairness Act, 15 U.S.C. § 45b ........................................................ 20, 21, 27

Business Opportunity Rule, 16 C.F.R. pt. 437 ......................................................... 19, 20, 21, 24

    16 C.F.R. § 437.1 ..................................................................................................... 24, 26

    16 C.F.R. § 437.2 ..................................................................................................... 25, 26

    16 C.F.R. § 437.3 ..................................................................................................... 25, 26

    16 C.F.R. § 437.4 ..................................................................................................... 25, 26

    16 C.F.R. § 437.6 .......................................................................................................... 25

Impersonation Rule, 16 C.F.R. pt. 461 ........................................................................ 19, 20, 21

    16 C.F.R. § 461.3 .......................................................................................................... 27

**Rules**

Federal Rules of Civil Procedure

    Fed. R. Civ. P. 26 .......................................................................................................... 33

    Fed. R. Civ. P. 65 .......................................................................................................... 33

**INTRODUCTION**

The Federal Trade Commission ("FTC") respectfully requests that the Court immediately halt a business opportunity scheme that has defrauded consumers of at least $14 million. Operating as "Click Profit" and other names, Defendants trick consumers into paying tens of thousands of dollars to own e-commerce stores on platforms like Amazon. Defendants promise to fully stock and manage the stores, and to generate "passive income" of hundreds of thousands, or even millions, of dollars for each consumer, at "no risk whatsoever." Defendants further claim that they source quality products directly from popular brands like Nike and Disney, and that are chosen by sophisticated artificial intelligence. These claims are false. The vast majority of consumers fail to achieve the promised earnings and instead lose tens of thousands of dollars. To conceal their fraud, Defendants have hidden behind a maze of interrelated entities and bank accounts and lied about their business to third parties such as payment processors and the Better Business Bureau. They have also threatened to take legal action against consumers who complain, request refunds, or post truthful negative reviews. And they have spent lavishly on themselves, using consumer funds to buy luxury cars, watches, and real estate.

Defendants' ongoing unlawful conduct has caused millions of dollars in consumer injury. The FTC's temporary restraining order would stop Defendants' illegal practices and provide ancillary equitable relief, including an asset freeze, the appointment of a temporary receiver, immediate access to Defendants' business premises, turnover of business records, limited expedited discovery, and an order to show cause why a preliminary injunction should not issue. These measures are necessary to prevent continued consumer harm and Defendants' destruction of evidence, and to preserve this Court's ability to return money to injured consumers.

## BACKGROUND

I.    **Defendants' Unlawful Business Opportunity Scheme**

A.    **Overview of Click Profit's Scam**

Since at least 2021, Defendants, who do business as "Click Profit," "FBA Launch,"[1]

"Portfolio Launch,"[2] "Automation Industries," and "Elevated Ventures"[3] (collectively, "Click

Profit"), have deceptively advertised and sold e-commerce business opportunities that

purportedly generate "predictable cashflow consistently" and "effortlessly."[4] Defendants hold

themselves out as successful e-commerce experts with years of experience and dozens of

dedicated support staff.[5] In exchange for tens of thousands of dollars, Defendants promise to

create and manage online retail stores for consumers on platforms such as Amazon, Walmart,

TikTok, and eBay.[6] According to Defendants, consumers who purchase the business opportunity

can reap ongoing profits "by not having to do ANYTHING."[7]

To participate in the Click Profit business opportunity, consumers must pay a minimum

upfront fee ranging from around $50,000 to $75,000,[8] plus additional, ongoing payments of

hundreds or thousands of dollars, supposedly to purchase store inventory.[9] Defendants promise

---

[1] *See, e.g.*, PX2, Attach. K at 1 (referring to FBALaunch); PX3, Attach. E (similar).

[2] *See, e.g.*, PX2, Attach. K at 1 (referring to PortolioLaunch); PX1, Attach. J at 31 (similar); PX1, Attach. M at 23-24, 67-68 (similar).

[3] PX1 ¶¶ 34, 43-44 & n.5 (describing Elevated Ventures' receipt of consumer funds).

[4] PX3, Attach. B at 7-8.

[5] *See, e.g.*, PX3, Attach. A at 14:8-17; PX1, Attach. M at 16, 21-22; PX1, Attach. P at 27-28.

[6] *See, e.g.*, PX1, Attach. J at 2-3; PX1, Attach. M at 15-16.

[7] PX3, Attach. B at 10; *see also, e.g.*, PX1, Attach. J at 3 ("silent investors" will "invest in the thriving ecommerce sector without engaging in the day-to-day operational aspects"); PX1, Attach. M at 7 ("Click Profit manages every aspect of your store's operations."); PX3, Attach. A at 9:6-10 ("What if we also solved your biggest pain point by not having to do anything" and "truly removed all effort?").

[8] *See, e.g.*, PX1, Attach. J at 15-16; PX1, Attach. M at 62; PX2, Attach. C at 16:21-22 (salesperson stating that "[t]he startup fee is between 45 grand and 75 grand").

[9] *See, e.g.*, PX1, Attach. M at 70; PX5 ¶¶ 26-28; PX2, Attach. F at 1 ("Click Profit's upfront fee is $45k, plus $10k recommended for initial inventory purchase."); PX1, Attach. P at 35

2

that consumers will earn their store's sales revenue, minus various fees and expenses, including (1) fees charged by the e-commerce platform (e.g., Amazon);[10] (2) Click Profit's processing fees (at least $3 per unit sold);[11] and (3) Click Profit's "profit split," which is tied to the consumer's initial payment. For example, a consumer who pays an initial fee of $50,000 may have a 50/50 split (i.e., 50% of the store's net revenue to the consumer and 50% to Defendants); a $60,000 payment may have a 60/40 split; and a $75,000 payment may have a 75/25 split.[12]

In their advertisements, marketing materials, and sales pitches, Defendants make three key promises to attract prospective purchasers: that (1) consumers will earn substantial income; (2) Defendants have negotiated special contracts with name-brand companies enabling them to buy products at low prices and then resell them at high margins; and (3) Defendants use proprietary technology involving artificial intelligence to select high-demand products. As explained below, these claims are false.

**B.     Click Profit's False and Unsubstantiated Earnings Claims**

Many consumers learn about Click Profit from the company's search engine and social media advertisements, which falsely promise "insane returns month over month that far exceed[]

---

(minimum inventory fee is $10,000); PX5 ¶¶ 18, 28 (consumer paid $20,000 for inventory); PX6 ¶¶ 4, 8 (consumer paid $10,000 for inventory).

[10] PX4 ¶ 20; *see also, e.g.*, PX1, Attach. P at 23 (describing Amazon fees of 8-15%); PX2, Attach. E at 16:6-15 (similar).

[11] *See, e.g.*, PX1, Attach. CC (consumer invoices); PX2, Attach. E at 19:24-20:1 ("[E]very single package that we ship out, there's a $3 cost to it. We take that off the gross revenue as well.").

[12] *See, e.g.*, PX1, Attach. J at 15-16; PX5 ¶ 7. The various tiers and splits may vary over time. *See, e.g.*, PX1, Attach. M at 62 (65/35 split for lowest tier); PX2, Attach. E at 11:8-14 (similar).

3

anything" in other investments.[13] These "consistent,"[14] "safe,"[15] "passive,"[16] and "predictable"[17] earnings allegedly translate into hundreds of thousands, or even millions, of dollars "while you sleep."[18] For instance, in the Google advertisement below, Defendants tout that they will "build, manage and scale [Amazon] FBA stores to 6, 7 & 8 figs (with 100% guarantee)."[19]

**Figure 1 – Google Advertisement (2024)**



Other social media advertisements expand on these claims. For example, the following Instagram ad claims to show a consumer's Amazon store making over $80,000 in sales in just 30 days.[20]

---

[13] PX1, Attach. K at 9:10-12; *see also, e.g.*, PX3, Attach. B at 48 ("earn an ROI that far exceeds [real estate] and stocks").

[14] *See, e.g.*, PX1, Attach. U at 3:7-9 ("enjoy consistent, resilient returns").

[15] *See, e.g.*, PX1, Attach. K at 5:15-16 ("one of the safest ways to generate real cash flow").

[16] *See, e.g.*, PX3, Attach. A at 15:3-8 ("earn passive income that blows" other investments "out of the water and eliminates any downturn and risks to you and allows you to get paid every two weeks"); PX3, Attach. E. at 2 ("get a 100% handsfree passive income"); PX1, Attach. K at 5:20-21 ("we help our silent partners generate passive income"); PX1, Attach. X ("passive income" and "passive ecommerce"); PX1, Attach. S at 6 ("your passive income journey"); PX1, Attach. M at 58 ("The Allure of Passive Income").

[17] *See, e.g.*, PX3, Attach. A at 6:17-22, 8:21-9:5; PX3, Attach. B at 7.

[18] PX1, Attach. S at 1, 5.

[19] PX1, Attach. X at 16. "FBA" refers to "Fulfillment by Amazon," a method in which Amazon (as opposed to the third-party seller) stores and processes consumers' orders. *See* https://sell.amazon.com/fulfillment-by-amazon.

[20] PX1, Attach. V-1 at 9.

**Figure 2 – Instagram Advertisement (2024)**



Defendant Emslie, who is a co-founder[21] and the face of Click Profit, personally makes many of the false claims, as he stars in nearly every social media video. He tells consumers that "we'll scale your store to six, seven, or even eight figures,"[22] and that "you don't have to take my word for it," because other consumers have made $13,000 in sales their first month for a "58.2% ROI in just thirty days."[23] In other advertisements, Emslie fans himself with stacks of $100 bills, highlights stores with huge monthly sales, like one below that purportedly made over $100,000 one week,[24] and tells consumers to "turn Amazon into your personal gold mine."[25]

---

[21] *See, e.g.*, PX1, Attach. A at 7, 10; PX2, Attach. J at 43; PX3, Attach. D at 1 (Emslie describing himself as "one of the founders of Click Profit").

[22] PX3, Attach. A at 7:19-20.

[23] PX1, Attach. O at 6:19-7:1.

[24] PX1, Attach. S at 2, 7.

[25] PX1, Attach. V-1 at 1.

**Figure 3 – Click Profit TikTok Ads (2024)**



Defendants also claim the substantial earnings are risk-free because of their money-back guarantee. As Emslie describes in ads: "We'll do $100,000 in sales in 52 weeks or less—one year—or you get every single penny of your investment back."[26] Emslie claims this guarantee provides "legal protection," ensures "a ZERO % chance you lose money,"[27] and is "no questions asked."[28] In other ads, Emslie asserts that these guarantees "ensure that every single person that partners on a store with us has a massively profitable store and has massive upside with zero downside,"[29] and that other investments "will never be able to offer you that level of security."[30]

---

[26] PX3, Attach. A at 6:3-5; *see, also e.g.*, PX3, Attach. B at 1 (similar); PX1, Attach. U at 4:2-3 ("[I]f your store doesn't make $150,000 in two years, we'll refund every single penny."); PX1, Attach. K at 8:11-13 ("[I]f you do not make $150,000 in the first 104 weeks, we will refund you all your money back, buy all of your products, no questions asked."); PX2, Attach. A at 14 ("an ecom portfolio that generates $150k in sales or your money back"); PX1, Attach. T at 5 ("Don't hit up to $100k in sales? Full refund.").

[27] PX5, Attach. C at 1.

[28] PX1, Attach. L at 5:13-18.

[29] PX3, Attach. A at 5:22-6:2; *see also id.* at 6:22-25 (people can "maximize their returns without exposing themselves to any risk"); 8:21-9:5 ("zero risk to you and zero downside for you"); PX3, Attach. B at 9 (similar); PX5 ¶ 12 (Emslie stating there is "absolutely no losing").

[30] PX1, Attach. K at 8:14-15.

Defendants' misleading advertisements use links to funnel consumers to Click Profit websites that repeat the false earnings claims. On the website clickprofit.io, for example, Defendants assure consumers that they can earn $120,000 per year on the "low side."[31] Another website claims the "average" consumer makes $142,833 in profit from $446,509.56 in revenue per year—emphasizing that, while these results may seem impressive, "half our [clients] did **BETTER**," as the top 20% earned "$902,851.88 in NEW revenue/yr."[32]

**Figure 4 – Click Profit Website (2024)**



Defendants' websites also prominently feature testimonial videos with Emslie, in which purported consumers boast about their successes. In one testimonial on clickprofit.io, "Stephen" claims that "[t]he ROI has kind of been off the charts," in the range of "92% or something, pushing 100%," and described how "the last two-week period went from $4,600 to over $28,000 [in sales]. That's insane."[33] In another, "Angie" says that she made over $160,000 in sales one July with little effort.[34] "Sean," too, says that "I can focus on what I love doing without worrying about the online store," and a screenshot shows his Amazon store purportedly earning over

---

[31] PX3, Attach. B at 22.
[32] PX1, Attach. N at 2-3.
[33] PX1, Attach. M at 25.
[34] *Id.* at 27-28.

$85,000 in sales one January.[35] These claims are amplified by screenshots of dozens of supposedly high-earning stores, including one that touts monthly Amazon sales of over $540,000 and another with claimed annual Walmart sales of over $4 million.[36]

Defendants solicit contact information from interested consumers on these websites and then send them promotional emails with additional earnings misrepresentations.[37] One email boasts that Click Profit has resources to "**take an ecommerce store to $100k+/month on autopilot**," attaching screenshots of Amazon stores purportedly making $23,000 and $540,000 a month.[38] A sales presentation by Defendant McGeoghean, another Click Profit co-founder, claims that consumers will "get a 100% handsfree passive income," "We Can *Guarantee* It," "**We want the ROI at or around ~30%!**" and also showcases purported store earnings like the below examples with annual sales of nearly $14 million and $4 million.[39]

Figure 5 – Click Profit Email Slideshow (2023)



---

[35] *Id.* at 29-30.

[36] *Id.* at 44-45; *see also, e.g.*, PX1, Attach. J at 18-30; PX1, Attach. P at 38-44; PX3, Attach. B at 60; PX3, Attach. F at 54.

[37] *See, e.g.*, PX1, Attach. M at 18-19, 50-51; PX1, Attach. W at 2; PX2 ¶¶ 8, 19-20; PX3 ¶¶ 9-12.

[38] PX2, Attach. J at 44-46.

[39] PX3, Attach. E at 2, 8, 14.

Defendants' promotional emails also include testimonials like the ones on Click Profit's website,

including the examples below claiming "Angie" made over $165,000 one month, or featuring

"Sulia's Investment Triumph"—a "102% [return on investment] with Minimal Effort."[40]

**Figure 6 – Click Profit Pitch Deck (2023)**



Consumers who provide their contact information on Defendants' websites also receive

multiple, hours-long calls from a Click Profit salesperson who aggressively pitches the scheme.[41]

Click Profit doubles down on its claims that consumers will generate substantial earnings, saying

that "our clients yearly are usually seeing anywhere from 60 to 120 percent return on their

cash,"[42] or that consumers can anticipate a 18-30% return every 30-60 days.[43] Click Profit also

offers to put interested consumers in touch with a purported client reference, one of whom

bragged that he became wealthy thanks to Click Profit and woke up to another $10,000 in his

---

[40] PX3, Attach. F at 36, 43.

[41] PX2 ¶¶ 7-16; PX5 ¶¶ 6-14.

[42] PX3, Attach. C at 13:1-3.

[43] *See, e.g.*, PX2, Attach. F at 2 ("Conservative estimate of 20% ROI per inventory 'flip' (30-60 days to sell through)."); PX1, Attach. Q at 4:17-5:4 (an "extremely conservative" scenario is "a 19 percent estimated return in just 60 days," and you can "rinse and repeat that cycle . . . four to six times a year"); PX2, Attach. E at 35:14-20, 40:23-41:3, 52:3-7.

bank account every day.[44] After these calls, Defendants encourage consumers to promptly sign

Click Profit's contract and make the required initial payment, adding pressure by saying there are

limited spots and consumers are losing money by waiting.[45] And even after consumers sign,

Defendants continue to deceive consumers into continuing to make ongoing payments;

Defendant Masri has told newly enrolled consumers, for example, that he would make them a

20% return in just 3 months.[46] At no point during the sales process do Defendants give

consumers data substantiating their various earnings claims, or other legally required disclosures,

including a list of Click Profit's consumers and legal actions against the company.[47]

Defendants' claims about consumers' earning potential, including those made in the

consumer testimonials, are false and baseless. Click Profit does not deliver anywhere close to the

substantial income Defendants promise; in reality, most consumers lose tens of thousands of

dollars.[48] Before deducting Defendants' fees, around 21% of Click Profit's approximately 230

Amazon stores earn no sales revenue *during their entire lifetime*, around a third earn less than

$2,500, and the median store earns only $7,200 in sales.[49] Defendants' fees—including the

processing fees and profit split of up to 50% of sales—sap any remaining gains, which come

---

[44] PX5 ¶ 11; *see also, e.g.*, PX2 ¶¶ 17-18 & Attach. l at 15:8-16:17 (another reference claiming that "sales basically skyrocketed" and he was making $10,000/month).

[45] *See, e.g.*, PX1, Attach. O at 10:14-11:11 (Emslie saying, "Remember, we only work with ten new partners every single month . . . [W]ill you be left behind and watch others live the life that you have always dreamed of?"); PX1, Attach. T at 5-6 ("Limited Time Offer" for only 15 spots); PX1, Attach. L at 6:17-21 ("[W]e have zero incentive to sell you on this call since we only work with a select few clients every single month[.]"); PX1, Attach. S at 3 (only "accepting 5 additional partners this quarter").

[46] PX1, Attach. GG at 19.

[47] PX5 ¶ 15; PX2 ¶ 22; PX3 ¶ 13; PX6 ¶ 5.

[48] *See, e.g.*, PX5 ¶ 36 (consumer lost $46,500); PX6 ¶ 10 (consumer lost $85,000).

[49] PX4 ¶¶ 21-23. Notably, while Defendants offer stores on and post numerous testimonials from Walmart and TikTok, nearly all of their stores are on Amazon, and only two Walmart stores were found to be associated with Click Profit. Those two stores were active for only 4 and 6 months and terminated for "policy violation" and "tracking fraud." *Id.* ¶¶ 25-26.

nowhere close to recouping the tens of thousands of dollars in fees and inventory that consumers

have put in.

Click Profit is not a successful long term "investment"—indeed, the average store lasts

only about 6.7 months.[50] As of mid-2024, 78% of consumers' stores, or 179, were non-

operational.[51] And—despite Defendants' claims that account suspensions are "extremely rare

thanks to our strict compliance measures"[52]—95% of consumers' stores have been blocked,

suspended, terminated, or placed in what Amazon labels as "fraud" status at some point in time

because Click Profit had violated the platform's policies.[53]

### C.     Click Profit's False Affiliation and AI Claims

In its online advertisements and sales calls, Defendants claim to have "exclusive

wholesale licenses" with name-brand companies—such as Disney, Nike, Yeti, Mattel, Ray-Ban,

Marvel, and Dell—that allegedly enable Click Profit to purchase popular items in bulk at

discounted prices.[54] Defendants assure consumers that Click Profit "ONLY sell[s] name brand

products," and that "[w]e've partnered with some of the very best and biggest big box

manufacturers so you get access to tier 1 inventory with … incredible margins."[55] These brand

affiliation deals, which took "almost a decade" to build,[56] allegedly "have buying terms that

---

[50] *Id.* ¶ 19.

[51] *Id.* ¶ 13.

[52] PX1, Attach. O at 9:4-9 (assuring consumers that "[y]our income stream never stops").

[53] PX4 ¶ 13.

[54] PX1, Attach. R at 4:18-22; *see also, e.g.*, PX1, Attach. P at 12 (describing "hundreds of relationships with the very, best reputable manufacturers in the world"), PX1, Attach. K at 6:5-8 ("We've partnered with top brands, like Colgate, 3M, Dove, Yeti, and many more," and "have the rights to resell these highly trusted and liked products[.]"); PX1, Attach. M at 21 (displaying Disney, Dell, Nike, Marvel, and other brands); PX1, Attach. V-1 at 2-7 (similar).

[55] PX1, Attach. V at 4:13-16.

[56] PX3, Attach. A at 5:7-13.

exclude[] most people from being able to purchase products," and are one reason Click Profit supposedly outperforms competitors.[57]

Another competitive advantage Defendants promote is their supposed use of proprietary technology that, as McGeoghean describes in a sales presentation, "leverages machine learning and artificial intelligence" to "find the most profitable products to put in your store."[58] Defendants claim that a team of sixteen developers spent over three years and nearly $5 million building a "super computer"[59] "responsible for 100+ million in sales."[60] In an ad, Emslie describes this technology as "the first and only AI-backed bot" that analyzes "over three and a half years of real-life e-commerce data" compiled by product researchers, data analysts, credit acquisitions, supplier research, product negotiation, supplier acquisition, and other teams.[61] Defendants also say this "advanced AI" will "pinpoint top-performing inventory tailored to your store" to "guarantee top ranking and visibility."[62] According to one consumer, Defendants "relentlessly hyped" the prowess of this AI technology in sales pitches.[63]

Defendants' brand affiliation and AI claims are false. They do not have wholesale licenses, partnerships, or affiliations with name-brand companies that give them favorable deals;

---

[57] PX1, Attach. P at 6; *see, e.g.*, PX1, Attach. V at 4:16-18 ("[Y]ou get to sell in high-barrier-of-entry categories with extremely low competition."); PX3, Attach. E at 12 ("our established wholesale relationships" will "increase your overall profit margin"); PX2, Attach. E at 66:7-10 ("[We] get these agreements in place and actually sell these brand-name products, which an individual store . . . wouldn't be able to do."); PX2, Attach. C at 31:5-9 ("We're going to go partner with that company, buy in bulk directly from them, cut the middleman out.").
[58] PX3, Attach. E at 12.
[59] PX1, Attach. Y at 1.
[60] PX1, Attach. P at 2.
[61] PX3, Attach. A at 14:8-17; *see also, e.g.*, PX3, Attach. B at 50-51 (similar) PX1, Attach. J at 9 ("advanced analytics" and "AI-driven market research"); PX2, Attach. C at 43:1-9 (AI will "cherrypick the best [products] based on multiple data points," and that "gives us an edge").
[62] PX1, Attach. M at 12.
[63] PX5 ¶ 10.

rather, they purchase generic products from online wholesalers, such as Alibaba or Walmart, that sell to the general public.[64] As a result, consumers have even received warnings from Amazon and manufacturers accusing them of being unauthorized product resellers, resulting in store suspensions.[65] Finally, Defendants do not employ advanced AI to select profitable products.[66] In fact, Defendants' products consist of a seemingly random assortment of miscellaneous and off-brand consumer goods, such as LED string lights, makeup applicators, drying racks, stuffed animal "warmies," food storage bags, and paper clips.[67]

    **D.**    **Click Profit's Suppression of Negative Reviews**

    Defendants conceal their deceptive practices by silencing consumers. Click Profit customers must sign a standardized contract—while it has varied over time, it generally includes a "non-disparagement" clause mandating that the parties discuss any "issues or problems" in a "private manner."[68] It further prohibits consumers from publishing any "negative information regarding [Defendants], orally in writing, in any online or offline forum whatsoever," including on "social-media channel posts, messages, text messages, or phone calls."[69] The prohibition applies "regardless of whether such comments could be deemed factually true."[70]

    Defendants invoke these non-disparagement provisions to threaten consumers with litigation after they post negative reviews online or file complaints with the Better Business

---

[64] *See, e.g.*, PX1 ¶¶ 54-57 (payments to online suppliers); PX6 ¶ 8 (purchasing inventory from Walmart using consumer's credit card).

[65] *See, e.g.*, PX1, Attach. II at 56-61; PX6 ¶ 8 & Attach. B.

[66] *See, e.g.*, PX5 ¶¶ 23-24.

[67] *See, e.g.*, PX4 ¶ 24; PX6 ¶ 8; PX5 ¶¶ 22-24, 26.

[68] PX1, Attach. HH at 15; *see also, e.g.*, PX5, Attach. E ¶ 7 (similar); PX6 ¶ 3 & Attach. A (consumer describing she could not negotiate contract).

[69] PX1, Attach. HH at 15.

[70] PX5, Attach. E ¶ 7. Other versions of the contract prohibit "any oral or written statement to any person. . . or on any online platform" that places Defendant in a "negative light." *See, e.g.*, PX2, Attach. K at 8; PX1, Attach. II at 11, 46, 69; PX1, Attach. LL at 10.

Bureau ("BBB").[71] For example, when one consumer posted truthful negative reviews online and filed a complaint with the BBB after losing his life's savings to Click Profit, Defendant Emslie's attorney threatened to sue the consumer and take everything he and his wife owned, including their home and pensions.[72] Worried, the consumer agreed to have his online reviews taken down.[73] In other instances, Defendants refuse to provide refunds unless consumers sign a settlement agreement with similar prohibitions against truthfully sharing their experiences.[74] As a result, consumers have also declined to speak with the FTC about their experiences because they feared legal retribution from Click Profit.[75]

Defendants have also suppressed reviews by falsely telling the BBB that complaints were part of a smear campaign by competitors who were attacking them online, when in fact the reporting individuals were bona fide Click Profit consumers.[76] Defendants also falsely represented to the BBB that a consumer was lying about their negative experience with Click Profit because "[w]e are a marketing and consulting firm and do not have operations based around products or selling products."[77] These tactics have enabled Click Profit to maintain inflated ratings from the BBB and review websites like Trust Pilot, which Defendants prominently display on their websites and marketing materials to attract new consumers.[78]

---

[71] PX5 ¶¶ 30-36; PX1 ¶ 68.

[72] PX5 ¶¶ 31, 33-35.

[73] *Id.* ¶ 34.

[74] *See, e.g.*, PX1, Attach. II at 24, 30 (settlement agreement "confidentiality" clause prohibiting any statement that portrays Defendants "in a negative light").

[75] PX1 ¶ 68.

[76] *Id.* ¶ 65; PX1, Attach. HH at 8-9, 28, 30; PX1, Attach. II at 2-3.

[77] PX1, Attach. HH at 35.

[78] *See, e.g.*, PX2 ¶ 8 & Attach. B at 35-42; PX1, Attach. M at 2; PX1, Attach. JJ; PX1, Attach. KK; PX3, Attach. E at 9-11; PX3, Attach. F at 12, 56.

## II.    The Defendants

Four individuals—Craig Emslie, Patrick McGeoghean, Jason Masri, and William Holton—closely operate the Click Profit business opportunity scheme through at least eight interrelated entities: Click Profit, LLC, SA Automation Enterprise LLC, M23 Holdings, LLC, Click Profit Distribution, LLC, Automation Industries LLC, M7 Investments LLC, Express Ecom LLC, and Ecom Direct LLC ("Corporate Defendants").

### A.    The Individual Defendants

**Craig Emslie** is one of Click Profit's three founders, along with McGeoghean and Holton, and serves as the company's public face. He is an officer, manager, director, or member of Click Profit, LLC, SA Automation Enterprise, and Express Ecom LLC.[79] Emslie stars in many of Click Profit's advertisements and makes false or unsubstantiated claims to prospective purchasers, including about consumers' earnings potential and the products Click Profit sells in consumers' stores.[80] He has also obtained settlements prohibiting defrauded clients from commenting about their experience, and even hired an attorney to threaten litigation against clients who post negative reviews.[81] Emslie handles many of Click Profit's day-to-day operations, including acting as a signatory on bank and payment processing accounts used by Corporate Defendants to accept funds from consumers.[82]

**Patrick McGeoghean** is an owner, officer, manager, director, or member of Click Profit, LLC, M23 Holdings, LLC and M7 Investments LLC.[83] McGeoghean is one of the co-founders

---

[79] *See, e.g.*, PX1, Attach. A at 7-10 (listing Emslie as Click Profit's manager or co-founder); PX1, Attach. FF at 7-10, 17-21, 30-33 (listing Emslie as a beneficial owner of the three entities).
[80] *See supra* pp. 5-12.
[81] PX5 ¶¶ 33-35.
[82] PX1 ¶¶ 34, 44 & Tables 1-2.
[83] *See, e.g.*, PX1, Attach. C (M7); PX1, Attach. FF at 7-9, 25-27 (Click Profit, M23); PX1, Attach. HH at 2 (listing McGeoghean as co-founder of Click Profit).

of Click Profit and has created marketing materials with deceptive claims.[84] He is a signatory on bank and payment processing accounts the Corporate Defendants use to receive consumer payments and conduct corporate transactions, and he has registered domain names Defendants use to promote their scheme and communicate with current and prospective purchasers.[85]

As Click Profit's "operations manager," **Jason Masri** supervises employees and serves on the company's "leadership executive team" alongside the other Individual Defendants.[86] Masri is the sole owner, officer, director, or member of Automation Industries LLC and Click Profit Distribution, LLC, and he uses these entities to communicate with consumers, manage Click Profit's e-commerce stores, and sign contracts and settlement agreements that prohibit Click Profit consumers from commenting about their experience.[87] He is a signatory on bank and payment processing accounts used by the Corporate Defendants to accept funds from consumers and conduct corporate transactions.[88] He has also made deceptive earnings claims to consumers, and demanded that the BBB remove negative reviews about Click Profit.[89]

**William Holton** is an owner, officer, manager, director, or member of Click Profit, LLC, Express Ecom LLC, and Ecom Direct LLC.[90] Holton is one of the three co-founders of Click

---

[84] *See, e.g.*, PX3, Attach. E at 2 (slideshow "[c]reated by Patrick McGeoghean"); PX1 ¶ 17 & Attach. P (similar).

[85] *See, e.g.*, PX1 ¶¶ 34, 44 & Tables 1-2; PX1, Attach. Z (showing McGeoghean as registrant for clickprofit.org, clickprofit.io, clickprofit.info, fbalaunch.co, and other websites).

[86] PX2, Attach. G at 20:11-21; *id.* at 20:15-16 (salesperson stating that Masri manages Click Profit's employees and is "the guy who runs all the warehousing").

[87] *See, e.g.*, PX1 ¶ 5(b) & Attach. B at 1 (Automation Industries); PX1, Attach. FF at 1-3 (Click Profit Distribution); PX1, Attach. II at 5-20, 23-26, 29-33, 40-55, 66-76 (Masri's communications and contracts with consumers); PX4 ¶¶ 5-7, 10 (Masri and Automation Industries are associated with consumers' Amazon accounts).

[88] PX1 ¶¶ 34, 44 & Tables 1-2.

[89] *See, e.g.*, PX1, Attach. GG at 19; PX1, Attach. II at 78-79.

[90] PX1, Attach. A at 7-8 (Click Profit); PX1, Attach. D (Ecom Direct); PX1, Attach. FF at 17-21 (Express Ecom).

Profit, manages Click Profit's e-commerce stores, and is a signatory on payment processing accounts used by the Corporate Defendants to accept funds from consumers and bank accounts used to purchase inventory for Defendants' e-commerce stores.[91]

### B.  The Corporate Defendants

The Individual Defendants use a host of limited liability companies to operate their scheme, collecting over $14 million from consumers, commingling around $2.8 million among their various bank accounts, and spending over $3.5 million for personal expenses.[92]

**Click Profit, LLC** is one of the primary entities through which Defendants operate. Defendants collect money from defrauded consumers into Click Profit, LLC's bank accounts through direct digital payments (e.g., wire and Zelle payments) and merchant processing accounts that process credit card payments.[93] Defendants then use these funds to pay operating expenses and distribute money among themselves.[94] Click Profit, LLC's current managers are **SA Automation Enterprise LLC** and **M23 Holdings, LLC**, which are owned by Emslie and McGeoghean, respectively.[95] These entities have received hundreds of thousands of dollars from Click Profit, LLC and transferred money to Emslie's and McGeoghean's personal accounts.[96] In or around January 2023, Click Profit, LLC "merged" with **Automation Industries LLC**, which is owned by Masri and operates Click Profit's "wholesale" operations.[97] Defendants use Click

---

[91] PX1, Attach. A at 6-7 (listing Holton as co-founder of Click Profit, LLC); PX4 ¶¶ 5-7, 9 (Holton and Ecom Direct are associated with consumers' Amazon accounts); PX1 ¶ 44 & Table 2 (showing Holton as representative for payment processing account); *id.* ¶¶ 34, 54 & Tables 1, 7 (showing Holton as authorized signer for bank accounts that paid suppliers).

[92] PX1 ¶¶ 41-49 (consumer payments); *id.* ¶ 50 (comingling); *id.* ¶¶ 51-53 (personal expenditures).

[93] *Id.* ¶¶ 41-48.

[94] *Id.* ¶¶ 50-53.

[95] PX1, Attach. A at 10; PX1, Attach. FF at 25-27, 30-32.

[96] PX1 ¶¶ 50, 53.

[97] PX3, Attach. I.

Profit, LLC, Automation Industries LLC, and another Masri-owned entity, **Click Profit Distribution, LLC**, interchangeably to operate the bulk of their scheme. These entities advertise to, contract with, bill, and otherwise communicate with consumers,[98] manage Defendants' e-commerce stores,[99] and receive consumer payments through their bank accounts and payment processing accounts.[100]

Defendants use at least three other entities to manage Click Profit's day-to-day operations. **M7 Investments LLC**, owned by McGeoghean, has registered telephone numbers used by Defendants to communicate with prospective clients.[101] **Ecom Direct LLC**, owned by Holton, has managed and purchased inventory for Defendants' e-commerce stores, and operates an Ohio warehouse and office used by Defendants.[102] And **Express Ecom LLC**, owned by Emslie and Holton, has also purchased inventory for Defendants' e-commerce stores.[103]

The entities thus share employees, service the same clients, and share client data.[104] For example, a consumer may be pitched to by a Click Profit or Automation Industries representative, sign a contract with Click Profit, Click Profit Distribution, or Automation

---

[98] *See supra* pp. 2-13 (Click Profit's ads to consumers); *see, e.g.*, PX1, Attach. II (consumers describing sales and contracts involving Automation Industries); PX1, Attach. M at 66 (Click Profit website describing Click Profit Distribution as "the company that runs" Defendants' services); *id.* at 83 (listing Masri and Click Profit Distribution as consumer contacts); PX1, Attach. CC (Click Profit Distribution's bills to consumers); PX2, Attach. K (consumer contract with Click Profit Distribution); PX6 ¶¶ 2-10 (consumer interacted with all three entities).
[99] *See, e.g.*, PX4 ¶¶ 9-10.
[100] PX1 ¶¶ 41-48.
[101] PX1 ¶ 6 & Attach. C; PX1 ¶ 26 & Attach. AA.
[102] PX1 ¶ 7 & Attach. D (showing Holton's ownership); *Id.* ¶ 54 & Table 7 (inventory purchases); *Id.* ¶ 71 (warehouse location); PX3, Attach. H at 12:17-13:4 (Emslie giving tour of Ohio warehouse); PX4 ¶ 9 (Holton and Ecom Direct's management of stores).
[103] PX1, Attach. FF at 17-21; PX1 ¶ 54 & Table 7.
[104] *See, e.g.*, PX6 ¶¶ 2-10 (consumer's business transaction involved Click Profit, Automation Industries, Click Profit Distribution, Emslie, and Masri); *id.* ¶ 2 (Aliaga as Automation Industries sales representative); PX3 ¶ 8 & Attach. C (Aliaga as Click Profit sales representative); PX1, Attach. II at 75-76 (Masri in a consumer chat with "Click Profit Support").

Industries, pay Click Profit's bank account, and then have an e-commerce store managed by

Ecom Direct or Automation Industries.[105] In addition, the entities have comingled over $2.8

million: for example, Click Profit, LLC has transferred over $780,000 to M7 Investments LLC,

M23Holdings, LLC, Ecom Direct LLC, and SA Automation Enterprise, as well as nearly $1

million to Automation Industries LLC; Click Profit Distribution, LLC has also transferred

approximately $1 million to Click Profit, LLC and Automation Industries, LLC.[106]

## ARGUMENT

I.      **The FTC Act Authorizes the Court to Grant a Temporary Restraining Order and the Requested Relief**

The FTC brings this action under Sections 13(b) and 19(a)(1) of the FTC Act, 15 U.S.C.

§§ 53(b), 57b, which together authorize preliminary and final injunctive and monetary relief for

violations of FTC-enforced laws. Section 13(b) allows for injunctive relief to stop unlawful

conduct. 15 U.S.C. § 53(b); *see, e.g., FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1079

(11th Cir. 2021); *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1239 (11th Cir. 2017).[107]

And for violations of certain rules, including the Business Opportunity Rule, 16 C.F.R. pt. 437,

and Impersonation Rule, 16 C.F.R. pt. 461, both at issue here, Section 19(b) authorizes courts

"broad authority to grand remedies that are 'necessary to redress injury to consumers,'" which

can include, among other things, contract rescission, the refund of money or return of property,

---

[105] *See, e.g.*, PX6 ¶¶ 2-6; PX1, Attach. II at 1-20, 36-61 (consumers describing involvement with Click Profit, Automation Industries, Emslie, and Masri); *see supra* p. 18 & n. 102 (Ecom Direct).
[106] PX1 ¶ 50 & Table 4.
[107] 15 U.S.C. §53(b) provides that, "in proper cases the Commission may seek," and "the court may issue, a permanent injunction," which also encompasses a preliminary injunction. *See FTC v. Simple Health Plans, LLC*, 792 F. App'x 761, 762 (11th Cir. 2020); *FTC v. Am. Vehicle Prot. Corp.*, No. 22-CV-60298, 2022 WL 14638465, at *11 (S.D. Fla. Oct. 25, 2022). The separate provision of § 53(b), which requires the FTC to pursue administrative proceedings to maintain a preliminary injunction, does not apply here. *See Simple Health*, 792 F. App'x at 762.

payment of damages, an asset freeze, and a receivership. *FTC v. Simple Health Plans LLC*, 58

F.4th 1322, 1330 (11th Cir. 2023); 15 U.S.C. § 57b(b).[108]

## II.     The FTC Meets the Standard for Preliminary Injunctive Relief

Immediate preliminary injunctive relief is necessary to halt Defendants' scheme. Such

relief is warranted if "(1) [the FTC] is likely to succeed on the merits, and (2) injunctive relief is

in the public interest." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014); *see*

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991). "Unlike private litigants, the

FTC need not demonstrate irreparable injury," which is presumed. *IAB Mktg.*, 746 F.3d at 1232;

*see Univ. Health*, 938 F. 2d at 1218; *FTC v. Kroger Co.*, No. 3:24-CV-00347, 2024 WL 5053016,

at \*1 (D. Or. Dec. 10, 2024) (holding the FTC Act "explicitly modif[ies] the traditional equitable

criteria"). In balancing the equities, "the public interest should receive greater weight" than any

private interest. *FTC v. USA Beverages, Inc.*, No. 05-61682 CIV, 2005 WL 5654219, at \*8 (S.D.

Fla. Dec. 6, 2005), *report and recommendation adopted*, No. 05-61682, 2005 WL 5643834 (S.D.

Fla. Dec. 9, 2005). As demonstrated below, the FTC meets both elements here.[109]

### A.     The FTC Is Likely To Succeed on the Merits

To establish likelihood of success, the FTC need not present evidence to justify a "final

determination" that Defendants have violated the law; a "preliminary assessment" of ultimate

success is enough. *Univ. Health*, 938 F.2d at 1218. At this stage, the court may consider hearsay

---

[108] Relief under Section 19(b) is available for rules "respecting unfair or deceptive acts or practices" under the FTC Act. 15 U.S.C. § 57b(a)(1), (b). The Business Opportunity and Impersonation Rules are such rules. *See* 16 C.F.R. pt. 437 (Business Opportunity Rule); 16 C.F.R. pt. 461 (Impersonation Rule). Similarly, a violation of the Consumer Review Fairness Act "shall be treated as a violation of a rule defining an unfair or deceptive act or practice[.]" 15 U.S.C. § 45b(d)(1).
[109] Although the FTC need not show irreparable harm, it has nevertheless done so here. *See infra* pp. 33-34. It has also met the other elements of the non-statutory test applicable to private litigants. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see infra* pp. 20-31.

and other evidence that may be inadmissible at the permanent injunction stage. *See, e.g.*, *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

The FTC submits ample proof showing it is likely to succeed on the merits. Defendants are violating Section 5 of the FTC Act, 15 U.S.C. § 45, and the Business Opportunity Rule, 16 C.F.R. pt. 437, by making false or unsubstantiated earnings, brand affiliation, and product selection claims and by engaging in unfair review suppression tactics; they are violating the Impersonation Rule, 16 C.F.R. pt. 461, by falsely representing their supplier relationships; and they are violating the Consumer Review Fairness Act, 15 U.S.C. § 45b, by contractually prohibiting consumers from sharing truthful reviews. The evidence also shows that the Individual Defendants are personally liable for these violations because they controlled, had knowledge of, and participated in the unlawful practices.

           1.    *Defendants Are Violating the FTC Act (Counts I-III)*

                 a.    Defendants Make Material Misrepresentations about the Click Profit Business Opportunity (Counts I and II)

Section 5(a) of the FTC Act prohibits "deceptive acts or practices." 15 U.S.C. § 45(a)(1). A violation exists where (1) there is a representation or omission; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) that representation is material. *See, e.g.*, *On Point*, 17 F.4th at 1079; *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). A representation is likely to mislead consumers if it is false or lacks a reasonable basis. *See FTC v. Peyroux*, 723 F. Supp. 3d 1209, 1240 (N.D. Ga. 2024)*; FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1190 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009). A claim is material if it "involves information that is important to consumers" and is "likely to affect their choice of" a product, *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1190, and "[e]xpress claims, or deliberately made implied claims" are "presumed to be material," *FTC* v. *Transnet Wireless*

21

*Corp.*, 506 F. Supp. 2d 1247, 1267 (S.D. Fla. 2007); *see FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1364 (S.D. Fla. 2016); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999). Finally, "[p]roof of intent to deceive is not required." *Partners In Health*, 189 F. Supp. 3d at 1364.

Defendants make at least three deceptive claims: that (1) consumers are likely to earn substantial income; (2) Click Profit is affiliated with major brands, such as Nike and Disney; and (3) Click Profit uses AI software to choose profitable products. These claims are likely to mislead reasonable consumers because they are false—and, with respect to the earnings claims, Defendants cannot substantiate them. As previously explained, consumers do not earn substantial income; to the contrary, most lose tens of thousands of dollars.[110] And Defendants place miscellaneous, generic goods in consumers' stores—not branded merchandise purchased through wholesale agreements and chosen by special AI algorithms.[111] Although the FTC need not prove subjective reliance or actual deception, testimony and complaints from consumers show they believed what Defendants told them.[112] *See FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1361 (S.D. Fla. 2019), *aff'd*, 801 F. App'x 685 (11th Cir. 2020). Such evidence "is highly probative" that Defendants' claims are likely to mislead consumers. *Id.*

Defendants' claims are express, and thus presumed material. They also are demonstrably material, because the amount of money one can earn is a key reason a consumer purchases a business opportunity. *See, e.g.*, *Transnet*, 506 F. Supp. 2d at 1264 (representations about earnings are material); *cf. FTC v. Zaappaaz, LLC.*, No. 4:20-CV-2717, 2023 WL 5020618, at *12 (S.D. Tex. June 9, 2023), *report and recommendation adopted*, No. 4:20-CV-02717, 2023 WL 5018433

---

[110] *See supra* pp. 10-11.
[111] *See supra* pp. 12-13.
[112] *See generally* PX5 ¶¶ 8-13; PX6 ¶ 2; PX1, Attachs. GG-II (consumer complaints).

(S.D. Tex. Aug. 3, 2023) (representations about guarantees are material); *FTC v. Cardiff*, No. ED-CV-18-2104, 2020 WL 6540509, at \*15 (C.D. Cal. Oct. 9, 2020) (similar).

Based on the above, the FTC has demonstrated a likelihood of success on Counts I and II.

        b.    Defendants Use Manipulation, Intimidation, and Threats to Block Negative Reviews (Count III)

The FTC is likely to prevail on Count III, which alleges that Defendants unfairly suppress reviews. Under the FTC Act, a practice is unfair if it "causes or is likely to cause substantial injury," is not "reasonably avoidable by consumers," and is not "outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). Defendants' review suppression tactics satisfy each element.

Defendants intimidate consumers, threaten them with litigation, and invoke non-disparagement provisions to force them to take down truthful reviews shared with third parties.[113] Defendants have also suppressed negative reviews by lying to the BBB that complainants were competitors trying to smear them.[114] These tactics are likely to cause substantial injury to threatened consumers and new consumers by creating a "positive feedback loop" that enables Defendants to dupe more consumers into paying tens of thousands of dollars to join the scheme. *FTC v. World Pat. Mktg., Inc.*, No. 17-CV-20848, 2017 WL 3508639, at \*15 (S.D. Fla. Aug. 16, 2017). Indeed, as this Court explained in *World Patent Marketing*, the use of "threats and intimidation to preserve [a] reputable façade" is unfair because it "limit[s] the flow of truthful information" and allows defendants to deceive additional consumers. *Id.*; *see also FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1394-96 (M.D. Fla. 2018) (holding gag-clause practices to be unfair). These injuries cannot be avoided by consumers who are threatened or

---

[113] *See supra* p. 13.

[114] *See supra* p. 14.

23

deprived of truthful information, and suppressing honest feedback has no benefits to consumers or competition. *World Patent Mktg.*, 2017 WL 3508639, at *15. The FTC is therefore likely to prevail on its claim of unfair review suppression.

      2.     *Defendants Are Violating the Business Opportunity Rule (Counts IV-VII)*

The Business Opportunity Rule helps prospective purchasers evaluate the risk of entering into a new business. *See generally* 16 C.F.R. pt. 437. The Rule requires sellers to, among other things: (1) provide prospective purchasers with specified information in a disclosure statement; (2) provide an earnings claim statement; and (3) refrain from making misrepresentations about the opportunities they sell.

Defendants are sellers of business opportunities under the Rule, which covers any "commercial arrangement" in which a "seller solicits a prospective purchaser to enter into a new business"; the "prospective purchaser makes a required payment"; and the seller represents, "expressly or by implication," that it will "[p]rovide outlets, accounts, or customers, including Internet outlets, accounts, or customers, for the purchaser's goods or services." 16 C.F.R. § 437.1(c). Here, Defendants solicit prospective purchasers to enter into a new business— opening an e-commerce store—in exchange for a required payment, including an upfront fee of $50,000 or more, as well as additional, ongoing inventory payments. And Defendants offer to provide "outlets" in the form of e-commerce stores on Amazon, Walmart, TikTok, or eBay, where end users will purchase the consumers' goods. *Id.* § 437.1(c)(3)(ii).

As detailed below, the FTC is likely to prevail on its claims that Defendants violate the Rule by making false or unsubstantiated earnings claims and by failing to provide prospective purchasers with required written disclosures (Counts IV-VII).

24

a.   Defendants Misrepresent Consumers' Earnings (Count IV)

The Business Opportunity Rule prohibits sellers from "[m]isrepresent[ing] the amount of sales, or gross or net income a prospective purchaser may earn, or that prior purchasers have earned." 16 C.F.R. § 437.6(d). Defendants violate this provision by falsely claiming consumers will make substantial earnings, such as hundreds of thousands of dollars, as discussed above.[115]

b.   Defendants Make Unsubstantiated Earnings Claims and Fail to Provide Disclosures (Count VI)

Defendants also make unsubstantiated earnings claims and fail to provide required disclosures. Under the Rule, sellers must, for *each* earnings claim: (1) have a reasonable basis for the claim at the time it is made; (2) have written substantiation; (3) make that substantiation available upon request; and (4) give prospective purchasers a written earnings claim statement. 16 C.F.R. § 437.4(a). That statement must include, among other things, the dates each earnings claim was achieved; the number and percentage of all persons who achieved the stated earnings; and characteristics of those consumers that might have affected their earnings. *Id.* § 437.4(a)(4). Sellers must provide the statement at least seven days before a consumer signs a contract or pays the seller, whichever is earlier. *Id.* §§ 437.2, 437.3(a).

Defendants have no reasonable basis for their earnings claims, let alone written substantiation that they make available upon request, and they also fail to provide the required earnings claim statement to prospective purchasers.[116] Instead, a page on the bottom of Defendants' website merely lists a handful of "self-reported," unconfirmed anecdotes under the heading "Earnings Claim Substantiation."[117] Those few purported consumers allegedly met narrow, unrepresentative criteria, including participating in the business for at least 30 months

---

[115] *See supra* pp. 10-11.
[116] *See* PX5 ¶ 15; PX6 ¶ 5; PX2 ¶ 22; PX3 ¶ 13.
[117] PX1, Attach. M at 85 (listing Masri and Click Profit Distribution as contacts for earnings).

and paying at least $135,000 for inventory, and the anecdotes omit required disclosures, such as the number and percentage of other consumers who achieved those earnings.

### c. Defendants Fail to Provide the Written Disclosure Document (Count V)

Sellers must also provide prospective purchasers with a specific disclosure document at least seven days before a consumer signs a contract or pays the seller, whichever is earlier. 16 C.F.R. § 437.2. That disclosure must include: (1) the seller's identifying information; (2) an earnings claim statement as previously described; (3) the seller's litigation history; (4) material terms of any cancellation or refund policy; and (5) contact information of prior customers. *Id.* § 437.3(a)(1)-(5). The disclosure must adhere to specific format and language requirements. *Id.* § 437.3(a) & Appendix A. Defendants fail to comply with these requirements.

### d. Defendants Make Unsubstantiated Earnings Claims in the General Media (Count VII)

Defendants also make improper earnings claims in the general media, which includes "any instrumentality" used to "communicate with the public." 16 C.F.R. § 437.1(h). Sellers can make such claims only if they have a reasonable basis and written substantiation for the claim. *Id.* § 437.4(b). The advertisement must also state, "in immediate conjunction" with the earnings claim, the beginning and ending dates the advertised earnings were achieved; and the number and percentage of all customers who purchased Defendants' business opportunity before that ending date and achieved at least the stated level of earnings. *Id.*

As discussed above, Defendants make numerous earnings claims in the general media, including on their websites, email solicitations, and social media. Those advertisements do not include the required information in the Rule, such as the dates of those earnings and the number

26

and percentage of consumers who have achieved them. Nor do Defendants have a reasonable basis or written substantiation for these claims, as the data shows that they are false.[118]

3.   *Defendants Are Violating the Consumer Review Fairness Act (Count VIII)*

The Consumer Review Fairness Act makes it unlawful to offer a "form contract" that "prohibits or restricts the ability of" a contracting party "to engage in a covered communication," which includes any "review, performance assessment, or other similar analysis" of goods or services. 15 U.S.C. § 45b(b)(1); *see Tennessee ex rel. Skrmetti v. Ideal Horizon Benefits, LLC*, No. 3:23-CV-00046, 2023 WL 2299570, at *5 (E.D. Tenn. Feb. 28, 2023). A "form contract" is one that contains "standardized terms" that cannot be meaningfully negotiated. 15 U.S.C. § 45b(a)(3); *see Washington v. Alderwood Surgical Ctr., LLC*, 730 F. Supp. 3d 1130, 1134 (W.D. Wash. 2024) ("applicable standard is not whether it was *possible* to negotiate" contract, but whether opportunity to negotiate was meaningful).

Defendants offer consumers "form contracts on a take-it-or leave-it basis," containing provisions prohibiting consumers from sharing truthful reviews of Click Profit.[119] *Alderwood*, 730 F. Supp. 3d at 1134. These contracts thus violate the CRFA.

4.   *Defendants Are Violating the Impersonation Rule (Count IX)*

The Impersonation Rule makes it illegal to "materially misrepresent" an "affiliation with, including endorsement or sponsorship by," a business. 16 C.F.R. § 461.3(b). Defendants violate this Rule by claiming that they have relationships with well-known brands, including Nike, Disney, Mattel, Marvel, Dell, and others, that allow Click Profit's consumers to enjoy high profit margins on these goods. As discussed above, these claims are false and material.[120]

---

[118] *See supra* pp. 10-11.
[119] *See, e.g.*, PX6 ¶ 3 & Attach. A; PX5, Attach. E; PX1, Attach. HH at 15; PX2, Attach. K at 8; PX1, Attach. II at 11, 46, 69; PX1, Attach. LL at 10.
[120] *See supra* pp. 11-13, 22-23.

5.      *The Corporate Entities Are a Common Enterprise*

The Corporate Defendants operate as a common enterprise, so each can be held liable for the acts of the others. *See WV Universal Mgmt.*, 877 F.3d at 1240; *FTC v. Lanier L., LLC*, 715 F. App'x 970, 979-80 (11th Cir. 2017). To determine whether entities act as a common enterprise, courts consider the "pattern and frame-work of the whole enterprise." *FTC v. Life Mgmt. Servs. of Orange Cnty., LLC*, 350 F. Supp. 3d 1246, 1257 (M.D. Fla. 2018), *aff'd*, No. 19-14248, 2022 WL 703939 (11th Cir. Mar. 9, 2022). Non-exhaustive factors include "common control, the sharing of office space and officers, whether business is transacted through a maze of interrelated companies, unified advertising," and whether there is "real distinction" between the corporate defendants. *Id.*; *see, e.g.*, *Lanier*, 715 F. App'x at 979; *FTC v. Wolf*, No. 94-8119-CIV, 1996 WL 812940, at *7 (S.D. Fla. Jan. 31, 1996).

Here, the Corporate Defendants share officers and operate under the common control of Defendants Emslie, McGeoghean, Masri, and Holton, who own and operate each entity, either directly or through other entities they also own.[121] The Corporate Defendants work in tandem to make sales to consumers and then manage the consumers' e-commerce stores.[122] They routinely comingle funds, have transferred around $2.8 million among themselves since 2021, and share customers, employees, and office space, including a business location in Ohio.[123] These interchangeable shells thus depend on each other for business and have "strongly interdependent interests or the pooling of assets of revenues." *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1269 (S.D. Fla. 2019) (cooperating to sell services, sharing client data, comingling funds, and using similar space established common enterprise).

---

[121] *See supra* pp. 15-17.
[122] *See supra* pp. 17-19.
[123] *See supra* pp. 17-19.

### 6.   *The Individual Defendants Are Personally Liable*

Emslie, McGeoghean, Masri, and Holton are individually liable for the Corporate Defendants' misconduct because they "participated directly in the practices or acts or had authority to control them" and "had some knowledge of the practices." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996). In a "small, closely-held corporation," an "individual's status as a corporate officer gives rise to a presumption" of control, and there is "[a] heavy burden of exculpation" on him where the entity's "stock-in-trade is overreaching and deception." *Transnet*, 506 F. Supp. 2d at 1270; *see Partners In Health*, 189 F. Supp. 3d at 1368 (similar).

The Individual Defendants have authority to control the practices, often participate in them, and have more than "some knowledge" of the conduct. As the exclusive owners and managers of the closely-held entities used to run the scheme, the Individual Defendants have authority to control the misconduct. Emslie, McGeoghean, and Holton are owners or managers of Click Profit, LLC, and each is an owner of related entities that operate Click Profit's business.[124] Similarly, Masri holds himself out to consumers as an executive of the Click Profit enterprise—and he is the sole owner and manager of Click Profit Distribution, LLC and Automation Industries LLC, both of which are used to run Click Profit's e-commerce stores and receive consumer payments.[125] Those roles and ownership "alone are sufficient to establish" authority to control. *Partners In Health*, 189 F. Supp. 3d at 1368.

Although the FTC need only show that the Individual Defendants either had authority to control *or* participated in the misconduct, the evidence collected already indicates the FTC is also likely to demonstrate participation. *See FTC v. Atlantex Assocs.*, No. 87-0045-CIV, 1987 WL 20384, at *11 (S.D. Fla. Nov. 25, 1987), *aff'd*, 872 F.2d 966 (11th Cir. 1989) ("participation in

---

[124] *See supra* pp. 15-17.
[125] *See supra* pp. 16-19.

29

the fraudulent practices is not a requirement for liability"). As previously explained, Emslie has personally made each of the false claims at issue in this case and even intimidated a consumer into taking down a truthful, negative review of Click Profit.[126] McGeoghean and Masri have similarly made deceptive claims about earnings and product selection to consumers, and Masri has signed contracts with consumers containing non-disparagements provisions and serves as the point person for information about faulty earnings "substantiation."[127]

Finally, the Individual Defendants have "some knowledge" of the illegal practices, which is satisfied by "reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth"; actual knowledge is not required. *Transnet*, 506 F. Supp. 2d at 1270. The four individuals concocted a close-knit scheme to extract tens of thousands of dollars from consumers for a bogus business opportunity; they worked together to advertise inflated earnings, false brand affiliations, and supposed AI-powered product selection; and they coordinated to run the e-commerce stores, manage finances, otherwise further the scheme. Emslie, McGeoghean, and Masri also directly conducted the illegal activity, including by making the false claims at issue and signing illegal contracts, so they necessarily had knowledge. *See, e.g.*, *Partners In Health*, 189 F. Supp. 3d at 1367 ("An individual's degree of participation in the business is probative of knowledge."); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1207 (similar). And by managing Click Profit's e-commerce stores, Holton is well aware of how little consumers earn, and that Click Profit does not stock its stores with profitable products using artificial intelligence.[128]

---

[126] *See supra* pp. 5-12, 14.

[127] *See, e.g.*, PX3, Attach. E at 2 (slideshow by McGeoghean), PX1 ¶ 17 & Attach. P (similar); PX1, Attach. GG at 19 (earnings claim by Masri); PX1, Attach. M at 85 (Masri listed as contact for earnings issues); PX1, Attach. II at 20, 32-33, 56, 73-74 (contracts signed by Masri).

[128] *See, e.g.*, PX4 ¶ 9 (Holton managing stores); PX1 ¶ 54 & Table 7 (inventory purchases).

B.      **The Equities Tip in The FTC's Favor**

The equities warrant relief here. "The public interest in ensuring the enforcement of federal consumer protection laws is strong," *Simple Health*, 379 F. Supp. 3d at 1363, while private considerations are afforded "little weight," *Univ. Health*, 938 F.2d at 1225. In addition, where, as here, the FTC demonstrates likelihood of success on the merits, the benefit to the public is presumed. *See, e.g.*, *FTC v. Digital Income Sys., Inc.*, No. 20-24721-CV, 2020 WL 7481548, at *2 (S.D. Fla. Dec. 1, 2020), *report and recommendation adopted*, No. 1:20-CV-24721, 2020 WL 7480820 (S.D. Fla. Dec. 18, 2020). The public interest here—stopping Defendants' illegal practices, preventing further consumer harm, and preserving assets to repay consumers—"is compelling and entitled to great weight." *Simple Health*, 379 F. Supp. 3d at 1363. Defendants, by contrast, have no legitimate interest in continuing their unlawful scheme.

III.    **The Proposed *Ex Parte* TRO Is Appropriate and Necessary to Prevent Ongoing Harm and Preserve Final Relief**

The FTC seeks injunctive and monetary relief for defrauded consumers under Sections 13(b) and 19(b) of the FTC Act. To halt Defendants' misconduct, preserve the possibility of final relief, and prevent Defendants from dissipating assets and destroying evidence, the FTC respectfully requests that the Court enter an *ex parte* TRO that includes (1) prohibitions against Defendants' illegal conduct; (2) an asset freeze; (3) the appointment of a temporary receiver over the Corporate Defendants; (4) immediate access to Defendants' business premises; (5) turnover of Defendants' business records and other relevant information; and (6) limited, expedited discovery. Courts routinely grant such relief, *see, e.g.*, *Simple Health*, 58 F.4th at 1329-30 (affirming *ex parte* TRO with conduct prohibitions, asset freeze, receiver, immediate access, and expedited discovery); *FTC v. RivX Automation Corp.*, No. 1:24-cv-23152, Dkt. 12 (S.D. Fla. Aug. 21, 2024) (similar), including in cases involving similar e-commerce business opportunity

31

schemes, *see, e.g.*, *FTC v. Ecom Genie Consulting LLC*, No. 1:24-cv-23976, Dkt. 14 (S.D. Fla. Oct. 21, 2024).[129]

### A. The Court Should Stop Defendants' Ongoing Scam and Order an Asset Freeze, Receivership, and Turnover of Business Records

The FTC's proposed TRO lies within this Court's authority and is supported by the evidence. First, it requires Defendants to follow the law, prohibiting Defendants' ongoing deceptive, unfair, and unlawful practices outlined in the complaint. Such relief is common in FTC cases. *See, e.g.*, *On Point*, 17 F.4th at 1080; *Simple Health*, 58 F.4th at 1330.

Second, an asset freeze is proper because it "may be needed to make permanent relief possible"—here, consumer redress. *Gem Merch.*, 87 F.3d at 469; *see World Pat. Mktg.*, 2017 WL 3508639, at \*16. "The FTC's burden of proof in the asset-freeze context is relatively light." *IAB Mktg.*, 746 F.3d at 1234. It "does not need to present evidence that the assets will be dissipated," but "only show a concern that the Defendants' assets will disappear." *Simple Health*, 379 F. Supp. 3d at 1364; *see also World Pat. Mktg.*, 2017 WL 3508639, at \*17. Here, Defendants have already defrauded consumers of more than $14 million, spent substantial corporate funds on personal expenses, and transferred funds to various entities they control.[130] Bank records also suggest that consumer injury far exceeds the amount currently available for consumer redress.[131] Thus, freezing Defendants' assets is "necessary to preserve funds for a future monetary judgment" and avoid further dissipation. *Simple Health*, 58 F.4th at 1330. To help identify and secure these assets, the proposed TRO also provides for preservation of asset-related documents.

---

[129] Other courts have granted similar TROs in e-commerce cases with similar facts. *See FTC v. Ascend Capventures Inc.*, No. 24-cv-7660, Dkt. 29 (C.D. Cal. Sept. 13, 2024); *FTC v. TheFBAMachine*, No. 24-cv-6635, Dkt. 5 (D.N.J. June 3, 2024); *FTC v. Automators LLC*, No. 23-cv-1444, Dkt. 8 (S.D. Cal. Aug. 11, 2023); and *FTC v. AWS, LLC*, No. 18-cv-0442, Dkt. 29 (D. Nev. Mar. 14, 2018).
[130] PX1 ¶¶ 41-53.
[131] *Id.* ¶ 35.

The Court should also impose a temporary receivership over the Corporate Defendants, relief the "law has long recognized" as necessary to "'preserve and protect' property at issue pending its final disposition." *Simple Health*, 58 F.4th at 1329. A receiver can prevent further legal violations and prevent Defendants from profiting from their deceptive conduct. *See FTC v. Pukke*, 53 F.4th 80, 107-08 (4th Cir. 2022). A receiver would also help assess the extent of the fraud, trace proceeds, and independently report on Defendants' activities to the Court.

Finally, the FTC seeks immediate access to Defendants' business premises and business records, as well as limited expedited discovery. This relief will allow the FTC to identify and locate assets and evidence. District courts have broad discretion to manage discovery, including to expedite it. *See* Fed. R. Civ. P. 26(d); *Akridge v. Alfa Mut. Ins. Co.*, 1 F.4th 1271, 1278 (11th Cir. 2021); *All-Tag Corp. v. Checkpoint Sys., Inc.*, 408 F. Supp. 3d 1347, 1353 (S.D. Fla. 2019).

### B. The TRO Should Be Issued *Ex Parte*

Federal Rule of Civil Procedure 65(b) authorizes an *ex parte* TRO upon showing that "immediate and irreparable injury, loss, or damage" will occur if notice is provided. *See AT&T Broadband v. Tech Commc'ns, Inc.*, 381 F.3d 1309, 1319 (11th Cir. 2004). That standard is met here. If given notice, Defendants are likely to dissipate assets and destroy evidence. As further detailed in counsel's Rule 65 declaration, Defendants have routinely demonstrated that they will lie to conceal their scheme. For instance, to evade scrutiny from one of their payment processors so that they could continue receiving consumer credit card payments for their scheme, Defendants have used phony websites and business descriptions and falsely disavowed any relationship with a bona fide consumer who requested a chargeback.[132] In addition, they have misrepresented to the BBB that complaints filed against Click Profit are part of smear campaign

---

[132] PX1 ¶ 30 & Attach. DD at 6:5-15 (contending Click Profit consumer is "not even a client").

orchestrated by competitors, as opposed to legitimate grievances from real consumers.[133] And they have resorted to threatening and intimidating consumers who request refunds or post negative reviews about the company.[134] In addition, Defendants attempt to avoid detection by hiding behind a web of interrelated companies and shell entities. They have routinely shifted their business operations to new entities, and they have opened over 30 accounts spread across at least 6 financial institutions to transfer large amounts of money to each other.[135] Finally, the Individual Defendants have transferred at least $2 million in consumer funds to themselves and spent at least another $1.6 million on unrelated business expenses, family members, and extravagant personal expenses, including luxury vehicles, jewelry, and real estate.[136]

The FTC's experience in prior consumer fraud cases also illustrates why proceeding *ex parte* is warranted. In numerous cases, similarly situated FTC defendants dissipated significant assets and evidence once alerted of the case against them.[137] To ensure Defendants cannot "render fruitless the further prosecution of the action," the TRO should issue *ex parte*. *AT&T*, 381 F.3d at 1319.

<u>CONCLUSION</u>

The FTC respectfully requests that the Court grant its motion for an *ex parte* TRO with ancillary equitable relief against Defendants. The Court should also issue an order to show cause why a preliminary injunction should not issue.

---

[133] PX1 ¶ 65.
[134] *See supra* pp. 13014.
[135] PX1 ¶¶ 34, 50-53.
[136] *Id.* ¶¶ 51-53.
[137] *See* Rule 65 Declaration ¶ 26 (citing cases).

Dated: ___03/03/2025___

Respectfully submitted,

_____

Lisa W. Bohl (Special Bar No. A5503281)
James Davis (Special Bar No. A5502004)
Federal Trade Commission
Midwest Region
230 S. Dearborn Street, Suite 3030
Chicago, IL 60604
(312) 960-5624
lbohl1@ftc.gov
jdavis@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION