# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 1:25-CV-20973-LEIBOWITZ/TORRES

FEDERAL TRADE COMMISSION,

    *Plaintiff*,

v.

CLICK PROFIT, LLC, *et al.*,

    *Defendants*.

_____

**EXPEDITED MOTION**

## DEFENDANT WILLIAM HOLTON'S EXPEDITED MOTION PURSUANT TO FED. R. CIV. PRO 65(B)(4) TO DISSOLVE THE TEMPORARY RESTRAINING ORDER[1]

The Federal Trade Commission (FTC) has obtained an *ex parte* Temporary Restraining Order (TRO) freezing the entirety of Defendant William Holton's assets based on a complaint (Dkt. 1) and TRO memorandum of law (Dkt. 5) that barely mention him. Indeed, the Complaint mentions Mr. Holton by name just twice, and those allegations—"[a]t all relevant times to this Complaint" Mr. Holton managed, directed and controlled Click Profit, and that he is "an owner, officer, manager, director, or member of Click Profit"—are false.

As the FTC well knows, Mr. Holton divested his interest in Click Profit in October 2023, 18 months *before* this Complaint was filed. This factual inaccuracy is critical given that the overwhelming majority of the Complaint's accusations—including nearly all the allegedly false

---

[1] Fed. R. Civ. Pro. 65(b)(4) provides: "On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires." Notice was served on the FTC on March 17, 2025. Accordingly, as Mr. Holton is cognizant of this Court's upcoming trial, Mr. Holton endeavored to get this motion filed as soon as possible, and requests to be heard on this motion later this week, if possible.

statements to consumers—occurred *in 2024*. Despite this, the FTC went ahead and froze all of Mr. Holton's assets, putting him in a potential financial death spiral. The FTC will only "discuss" a possible release of assets allowing Mr. Holton to live *if* Mr. Holton first fills out a voluminous financial affidavit concerning assets and businesses that have nothing to do with this case. Even worse, the FTC is using the asset freeze to starve Mr. Holton of resources to fight the FTC's case, as evidenced by the FTC's demand that he now, before any discovery, "voluntarily" consent to a preliminary injunction that admits purported "facts" that he had nothing to do with. The FTC's actions—a total asset freeze to force Mr. Holton's capitulation is unconscionable and premised on inaccurate accusations. The TRO must be dissolved *post haste*.

Accordingly, Mr. Holton, individually and on behalf of any corporate entities that the FTC alleges are in his control, files this motion pursuant to Fed. R. Civ. Pro 65(b)(4) to dissolve the TRO that the FTC obtained against him or, in the alternative, to dissolve the asset freeze. Because the Rule allows the party against whom an *ex parte* TRO is entered to move to dissolve or modify "[o]n 2 days' notice," Mr. Holton respectfully asks this Court to hold argument on this motion as soon as possible.

## 1. Factual Introduction and Overview

### A. The FTC filed a complaint charging Mr. Holton and others with numerous violations of the FTC Act.

The FTC has filed a 39-page complaint alleging violation of Section 5(a) of the FTC Act, as well as the Business Opportunity Rule (16 CFR pt. 437), the Consumer Review Fairness Act (CRFA, 15 U.S.C. § 45(b)), and the Impersonation Rule (15 U.S.C. § 45b).  Dkt. 1 ¶¶ 1, 81, 98, 111, 117.

The FTC's action is premised on a purported business opportunity scheme called "Click Profit." *Id.*  ¶ 2.  According to the FTC, Click Profit is a business that "promises to make consumers

owners of fully operational, technologically sophisticated e-commerce stores," that sold products on Amazon, Walmart and TikTok, "but in fact bilks them out of tens of thousands of dollars." *Id*. The Complaint asserts that the Defendants marketed their scheme as a "lucrative, risk-free generator of 'passive income' that is powered by artificial intelligence ("AI") and affiliated with "well-known brands such as Nike and Disney." *Id*. ¶ 3. But, the FTC maintains, these risk-free profits were not true. The "highly touted AI technology and brand partnerships" did not exist and the "promised earnings never materialize[d]." *Id*. Rather, the Defendants used lies, deception and threats to fleece customers of money while providing little in return.

Specifically, the Defendants advertised Click Profit to customers on websites such as Facebook and TikTok. *Id*. ¶ 31. Click Profit, in exchange for an initial up-front payment of approximately $45,000, told customers that Click Profit would create an individual "store" for them on Amazon that sold a variety of products. *Id*. ¶ 24. In addition to setting up the store, Click Profit would "manage all logistics associated with running these stores, including product selection, shipping, and customer service; and split a percentage of profits generated by the stores with consumers." *Id*.

The Complaint focuses on the alleged deceptive advertisements and websites created by Click Profit. These deceptive advertisements claimed: "(1) Click Profit consumers will earn substantial income; (2) Defendants have negotiated partnerships or are affiliated with name brand companies such as Nike and Disney, enabling Click Profit to buy popular products in bulk at low prices so consumers can resell them at high margins in their stores; and (3) Defendants employ proprietary technology, consisting of advanced machine learning and AI, to select the products for the stores that they manage, thereby ensuring demand and profitability." *Id*. ¶ 28.

The Complaint includes different examples of the allegedly deceptive advertising that Click Profit used to lure in customers. *Id*. ¶¶ 29-57. Critically, nearly all the examples cited are from 2024. *Id.* Figures 1, 2, 3, 4, 5, 6, 8, 9, 10. Further, although the Complaint includes examples of advertisements made by (and including) Mr. Holton's co-defendants, there is not a single example of any advertisement featuring Mr. Holton, any advertisement allegedly created by Mr. Holton, or any advertisement distributed by Mr. Holton on the Internet. *Id*. ¶¶ 29-57.

In fact, despite the lengthy complaint, Mr. Holton is mentioned by name in just two paragraphs. *First*, Mr. Holton is mentioned in the introductory section. *See Id*. ¶ 20.

> Defendant William Holton is an owner, officer, manager, director, or member of Click Profit, LLC, Express Ecom LLC, and Ecom Direct LLC. At all times relevant to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. For example, Holton is a co-founder of Click Profit; he is a signatory on bank accounts used by the Corporate Defendants to accept funds from consumers; and he opens and manages Click Profit's e-commerce stores.

*Second*, Mr. Holton is named in paragraph 63, where the FTC contends that he serves on the "leadership executive team" of Click Profit and, together with others, "manage[s] the day-to-day operations" of the stores, including by "purchasing inventory, managing warehousing, and supervising other Click Profit employees." *Id*. ¶ 63. Other than those generic accusations, there is nothing in the Complaint about Mr. Holton—there is nothing about what Mr. Holton said or what he did; and, there is nothing about specific promises he made to customers or specific amounts of money he earned from unlawful conduct. Simply put, there is nothing in the Complaint, of substance, about Mr. Holton.

### B.  The *Ex Parte* Temporary Restraining Order

Although the FTC sought and obtained a full asset freeze, the memorandum in support of the TRO provides scant additional detail about Mr. Holton's involvement in the alleged scheme.

The TRO alleges that he is "an owner, officer, manager, director, or member of Click Profit, LLC, Express Ecom LLC and Ecom Direct LLC." Dkt. 5 at 16. The TRO claims that he was one of three co-founders of Click Profit, that he "managed Click Profit's e-commerce stores" and that he is a "signatory on payment processing accounts used to accept funds from consumers" and "bank accounts used to purchase inventory for Defendants' e-commerce stores." *Id*. at 16-17. With respect to the corporate entities associated with Mr. Holton, the TRO claims that eCom Direct LLC "has managed and purchased inventory for Defendants' e-commerce stores, and operates an Ohio warehouse and office used by Defendants." *Id*. And, Express Ecom LLC "has also purchased inventory for Defendants' e-commerce stores." *Id*.

In describing the various laws broken by the Defendants, all of them concerned representations that the Defendants allegedly made to consumers. *See* Dkt. 5 at 20-27. Specifically, the Defendants made material misrepresentations about the Click Profit business—that consumers would earn substantial income; that the company was affiliated with major brands; and, that Click Profit uses AI software to choose profitable products. The FTC further alleges that the Defendants: unfairly suppress negative reviews; violate the Business Opportunity Rule by failing to make required disclosures; misrepresent consumers earnings; make "unsubstantiated earnings claims and fail to provide disclosures"; offer illegal form contracts to consumers; and, are violating the Impersonation Rule by falsely claiming affiliations with major brands such as Nike. *Id*. Attached to the FTC's TRO are six declarations and exhibits, amounting to more than 1,000 pages. See Dkt. 5-3. Mr. Holton's name is only mentioned in three of the FTC's ten TRO exhibits, only two of which have anything to do with this case—PX1 and PX4. *See* Dkt 5-4 and Dkt 5-8. Both exhibits fail to support the FTC's contentions concerning Mr. Holton.

**The bank accounts on which Mr. Holton was a signatory received virtually no customer funds.** In PX1, FTC Investigator Douglas McKenney analyzed Defendants' financial records and prepared a table of Corporate Defendants' bank accounts (Table 1). Dkt. 5-4 ¶ 34. This table shows that Mr. Holton was an authorized signer for three accounts for his eCom Direct business, and one account for Express Ecom LLC. *Id*. The Table also shows that Mr. Holton was not an authorized signer of any of Click Profit LLC's nineteen accounts, nor any of Click Profit Distribution LLC's three accounts. *Id*. In addition, McKenney averred that between March 2021 and August 2024, Defendants received direct payments from consumers totaling $14,493,938. *Id*. ¶ 43. However, according to McKenney, not a single dollar of the direct payments went to eCom Direct LLC or Express Ecom LLC.

Out of a total of $16,287,088 received by Defendants between March 2021 and August 2024, McKenney's analysis shows that *only $4,120 went to eCom Direct LLC, and $0 to Express Ecom LLC, during this three-year period* (Table 2 and Table 3). *Id.* ¶¶ 44, 48. All of the $4,120 in payments came from Stripe sales. This means that, at most, only 0.025% of consumer payments can be traced to bank accounts on which Mr. Holton was a signatory. However, the declaration does *not* claim that this $4,120 in sales came from Click Profit customers.[2] *Id*. ¶ 44.

McKenney also analyzed Defendants' alleged "commingling" of funds and estimated that Defendants have allegedly commingled at least $2,808,937 between their various corporate bank accounts. *Id.* ¶ 50. In Table 4, McKenney wrote that Click Profit LLC transferred $257,764 to eCom Direct LLC between July 2021 and August 2024. *Id*. Given that eCom Direct is Mr. Holton's company, it is unclear how this is "commingling."

---

[2] Mr. Holton does not believe that the $4,120 sent to eCom Direct represented customer funds. Rather, he believes that these were funds for eCom Direct's own business activities. *See* Holton Decl. ¶ 22.

**McKenney's affidavit does not demonstrate that Mr. Holton has attempted to dissipate assets.** McKenney analyzed financial records to show that Defendants have spent consumer funds on personal expenses and unrelated businesses, and have transferred money to their personal accounts and to family members (Table 5). *Id.* ¶ 51. None of the transactions listed in Table 5 are related to Mr. Holton or to entities of which Mr. Holton is a member. *Id.* McKenney also analyzed bank records showing that the individual defendants have transferred at least $1,933,490 to themselves (Table 6). *Id.* ¶ 53. In Table 6, McKenney summarized the amounts transferred and found that Click Profit LLC transferred $363,899 to Mr. Holton between April 2023 and May 2024, while eCom Direct LLC transferred $32,000 to Mr. Holton between Dec. 2021 and Jan. 2023.

Finally, McKenney analyzed records for corporate American Express card accounts held by Click Profit LLC. Table 8 shows Mr. Holton as one of three card holders, with Craig Emslie and Patrick McGeoghean, for AMEX Business Gold account x5600 for Click Profit LLC. *Id.* ¶ 56. None of the expenses are broken down by which individual made the charges. *Id.* In addition, the expenses charged to the cards appear to be standard expenses for product supplies and advertising, none of which is illegal. *Id.* ¶¶ 57-60.

**The only other exhibit concerning this case that mentions Mr. Holton is PX4, the declaration of FTC Investigator Elizabeth Anne Miles**. The Miles declaration is scant on details tying Mr. Holton to any false or deceptive advertising. In attempting to show customer stores opened by Mr. Holton, Miles calls one spreadsheet of stores the "Holton et al. sellers." Dkt. 5-9 ¶ 9. But Miles does not explain how many stores were opened by Mr. Holton, who operated these stores, how many stores were connected with Mr. Holton's email addresses or even why the

spreadsheet is named after Mr. Holton. Miles provides no information demonstrating that Mr. Holton was involved with or responsible for false and deceptive advertising.

All the FTC's exhibits concerning the false and deceptive advertising do not mention Mr. Holton. Two declarations provided by consumers—PX5 (Declaration of David Blevins, Consumer) and PX6 (Declaration of Patricia Gase, Consumer)—do not mention Mr. Holton. Dkt. 5-10 and 5-11. Attachment JJ of the McKenney Declaration (PX1) shows Click Profit LLC's Better Business Bureau ("BBB") profile and lists Craig Emslie as the sole contact for "Business Management," "Principal Contacts," and "Customer Contacts." Dkt. 5-5 at 241. There is no mention of Mr. Holton.

Attachments HH and II of the McKenney Declaration are copies of documents produced by the BBB Boston and BBB West Florida, respectively, and include consumer reviews, consumer complaints, supporting documents for consumer submissions, the BBB's communication with Defendants, and Defendants' application materials. Dkt. 5-5 at 117-239. Mr. Holton is not mentioned in these two lengthy attachments, while other Defendants are mentioned many times. Similarly, Attachment GG to the McKenney Declaration provides copies of consumer complaints from the FTC's Sentinel system. Dkt. 5-5 at 66-115. Once again, Mr. Holton is never mentioned in these voluminous attachments.

Much of the FTC's TRO memorandum is based on complaints filed by consumers, which are attached to the declarations as exhibits. *See, e.g*., Dkt. 5-5 at 66-242. Set forth in <u>Appendix A</u> to this memorandum is a table summarizing the consumer complaints provided as exhibits by the FTC. (*See* Dkt. 5-5, Dkt, 5-10, and Dkt. 5-11). None of these complaints reference Mr. Holton.

Likewise, FTC investigators also performed their own investigation into Click Profit. In PX2, FTC Investigator Roberto C. Menjivar recounted his investigation of Click Profit LLC

through undercover telephone and/or video calls, focusing on the application and onboarding process of Click Profit LLC customers. Dkt. 5-7. Menjivar obtained a plethora of Click Profit LLC's materials, including an application questionnaire, FAQs, and onboarding materials. Mr. Holton is never mentioned, either in the Menjivar Declaration describing the undercover calls and conversations about the process for applying to become a Click Profit LLC customer, or in any of the other attachments.

In PX4, FTC Investigator Reeve Tyndall too recounts his investigation of Click Profit LLC, which focused on capturing Defendants' online marketing material. Dkt 5-8. Tyndall obtained a plethora of Click Profit LLC's materials, including Facebook advertisement videos, a Pitch Deck, a Pricing Sheet, as well as other marketing materials. Mr. Holton again is never mentioned. Attachment H of the Tyndall Declaration is a transcript of a video of Craig Emslie giving a tour of Mr. Holton's warehouse in Ohio, which was used to store and ship Click Profit customers' Amazon products. The video also does not reference Mr. Holton.

Despite this complete lack of involvement with any of the core allegations of the FTC's case, the FTC has still obtained a restraining order and full asset freeze, prohibiting Mr. Holton from spending *any* assets for *any* purpose.

### C.   Mr. Holton's Involvement with Click Profit LLC

Mr. Holton's role with Click Profit was limited and his ownership stake was terminated in October 2023. *See* March 17, 2025 Declaration of William Holton ("Holton Declaration"), ¶¶ 8, 18. Mr. Holton managed the Company's warehouse in Ohio where the products to fill customers' stores were received, stored, and shipped to Amazon on behalf of Click Profit LLC's customers. *Id*. ¶ 8. Far from evidencing fraud or deception, that Mr. Holton operated a warehouse facilitating the provision of products necessary for customers to succeed indicates his good faith. To be clear,

Mr. Holton had nothing to do with the advertising of Click Profit LLC to customers, which is confirmed by the FTC's failure to provide evidence of his involvement. *Id*. ¶¶ 10-11.

In 2023, Amazon began suspending a number of Click Profit customers' stores for so-called "Section 3" violations, meaning that Amazon had detected that many of the customers' stores were linked to the same platform, *i.e.*, Click Profit. *Id*. ¶ 15. Once a store is shut down due to a Section 3 violation, Amazon retains the products for a period of time and then returns them to the seller. *Id*. ¶ 19. Consequently, the goods that Mr. Holton shipped to Amazon in large pallets for resale were returned to his warehouse a few months later. *Id*. However, Amazon shipped them back in thousands of individual boxes, and it soon became impossible to store all these products in a warehouse stacked from floor to ceiling. *Id*. ¶ 20.

Because of this, Mr. Holton quit the business. *Id*. ¶ 17.  On October 17, 2023, Mr. Holton separated from Click Profit and executed a separation agreement whereby the other owners would buy out Mr. Holton's share of the business. *Id*. ¶ 18, *see* Holton Decl. Ex. F. Mr. Holton's separation from Click Profit is memorialized in the separation agreement, in the Florida Annual reports filed for Click Profit (they do not list his involvement in 2024 and 2025), and his K-1 forms that he received from Click Profit, which show his allocation percentage of profits dropping from 33% to 27.2% in 2023 (the reduction due to his separation in October of that year). *See* Holton Decl. Exhs. F, G, C.

For his one-third share of Click Profit, the other owners agreed to pay Mr. Holton $230,000. Holton Declaration ¶ 18, *see* Holton Decl. Ex. F. However, this did not solve the problem with the warehouse, which was now packed with items returned by Amazon. Accordingly, Mr. Holton (as an independent contractor) was paid a monthly fee to receive the

items back from Amazon and ship them elsewhere. Holton Declaration ¶ 21. This wind-down process took until July 2024, when the warehouse finally emptied. *Id*. ¶ 24.

Consequently, none of the sums of money mentioned in the FTC's Affidavit evidence violations of the FTC Act. From 2021 through to his separation from Click Profit on October 17, 2023, Mr. Holton received approximately $395,271.84 in distributions. As an employee of Click Profit, he received $57,664.57 during this same time period. After he left Click Profit, he received $35,292.33 to wind down the warehouse as an independent contractor. Last, Mr. Holton, in 2023 and 2024, received buy-out payments from Click Profit totaling $230,000. *Id*. ¶¶ 18-26.

Last, eCom Direct LLC—Mr. Holton's personal business LLC—was shut down by Mr. Holton on December 9, 2024. *Id*. ¶ 2. As for Express eCom LLC, Mr. Emslie and Mr. Holton opened this business together at the end of 2023. This business was their personal Amazon store, selling items such as meat slicers, cold plunge tubs, and pimple patches. *Id*. ¶ 28. This business had nothing to do with Click Profit. *Id*. Mr. Holton invested considerable sums of money in this enterprise, but the business lost money. *Id*. On February 13, 2025, Emslie bought out Mr. Holton's share of Express eCom LLC. Accordingly, the FTC's claim that Mr. Holton currently is an "owner, officer, manager, director or member" of Click Profit is false. Dkt. 1 ¶ 20. Likewise, the FTC's claim that Mr. Holton, "[a]t all times relevant to this Complaint … "formulated, directed, controlled" or had the authority to control "the acts and practices set forth in this Complaint" is also false. *Id*.

### 2. Legal Standards Applicable to a Preliminary Injunction and *ex parte* TRO

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corporation v. McKinney*, 144 S.Ct. 1570, 1576 (2024) (*quoting Winter v.*

*National Resources Defense Council, Inc*., 555 U.S. 7, 24 (2008)); *FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1077-78 (11th Cir. 2021).

Under 15 U.S.C. § 53(b), the Court may issue a preliminary injunction if the FTC proves both (1) a likelihood of ultimate success on the merits, and 2) that the balancing of equities favors such action. *FTC v. IAB Mktg. Assocs.*, *LP*., 746 F.3d 1228, 1232 (11th Cir. 2014). When balancing the equities, courts recognize that injunctive relief "is appropriate if the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future"; however, such relief may *not* be appropriate in instances where the defendant's actions are unlikely to recur. *See FTC v. USA Fin., LLC*, 415 Fed. Appx. 970, 975 (11th Cir. 2011). In addition, a motion for a preliminary injunction, to be successful, must be "supported by evidence." *See American Airlines, Inc. v. Spada*, 23-21844-CIV, 2023 WL 8001220, *4 (S.D.F.L. Nov. 2023).

As the FTC contends, their demand for injunctive and monetary relief against Mr. Holton is being brought pursuant to Section 13(b) and 19(a)(1) of the FTC Act. *See* Dkt. 5 at 31. *See also FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) ("To establish liability under section 5 of the FTCA, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances[;] and (3) the representation was material."). Section 13(b), as the FTC correctly notes, *does* allow for injunctive relief to stop unlawful conduct. However, Section 13(b) does *not* authorize asset freezes. *See AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021). Section 19 of the FTC Act does, as the 11th Circuit recently held, permit asset freezes, but Section 19 carries with it important limitations. Namely, it applies *only* to violations of certain rules (not the broader FTC Act). *See FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1328 (11th Cir. 2023). Here, the FTC maintains that the Defendants violated the

Business Opportunity Rule, 16 C.F.R. pt. 437, and the Impersonation Rule (16 C.F.R. pt. 461), which makes them eligible *under those rules* for an asset freeze.

Of course, to obtain a preliminary injunction (and a corresponding asset freeze), the FTC cannot simply lump all defendants together and generically plead that the "defendants" violated the law. Rather, the FTC must prove, with respect to each individual defendant, that the defendant took part directly in the deceptive practices or had the authority to control them, *and* that the individual had knowledge of the deceptive practices. *See FTC v. Vylah Tec LLC,* 328 F. Supp. 3d 1326, 1334 (M.D. Fl. 2018) (*citing IAB Mkg*., 746 F.3d at 1233)); *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir.1996) (*citing FTC v. Amy Travel Serv., Inc*., 875 F.2d 564, 573 (7th Cir.1989)).

In addition, in determining whether to freeze an individual's assets, a district court must make specific factual findings as to each target of the freeze. *See FTC v. Vylah Tec LLC*, 727 Fed. Appx. 998, 1002 (11th Cir. 2018). The factual findings must demonstrate that the defendant gained monies from the allegedly unlawful practices, and must identify the amount of the money that the defendant gained due to the fraud. *Id*. (FTC can only freeze funds to preserve the monies for disgorgement, which *may not exceed* the "amount obtained through the wrongdoing."). Such findings are needed to justify any asset freezes. *Id*.

Finally, *ex parte* TROs, which is what is at issue here, are governed by Fed. R. Civ. Pro. 65(b)(1), which allows for such orders only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and the "movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." The movant attorney's certificate must further "describe the injury and state why it is irreparable." *Id*. 65(b)(2).

3.   **This Court should dissolve the TRO with respect to Mr. Holton.**

   A.   <u>The FTC's Rule 65 Declaration Fails to Aver that an *ex parte* TRO is
   necessary.</u>

In support of its application for an *ex parte* TRO, the FTC filed, under seal, a Rule 65(b)

certification and declaration (the "Declaration") purporting to provide reasons why an *ex parte*

TRO was necessary. *See* Dkt. 6. With respect to Mr. Holton, the Declaration does not do that.

There are no specific allegations, at all, about Mr. Holton's involvement in any of the deception

set forth in ¶¶ 10-17 of the Declaration. These paragraphs refer generically to the "Defendants,"

and the few specific examples provided concern other co-defendants in this action.

And while the Declaration does briefly mention Mr. Holton's involvement in the "financial

tactics" section, the Declaration states only that "eCom Direct LLC," which was Mr. Holton's own

business entity was "used to operate Click Profit's Amazon e-commerce stores and purchase

activity." The Declaration says nothing about which stores were at issue, when that purchase

activity took place, or what eCom Direct's purported involvement was. *Id.* ¶ 22. Nor does the fact

that Mr. Holton ran a warehouse make him eligible for a TRO. *Id*.

Critically, the Declaration does not inform the Court that Mr. Holton's one-third ownership

of Click Profit LLC ended in October 2023, 18 months before the declaration was signed. Indeed,

the Court is left with the misimpression that Mr. Holton is *still* involved with Click Profit LLC,

which could be the only possible reason to justify an *ex parte* TRO in the first place. The FTC

simply cannot show "immediate and irreparable harm" without ongoing activity by Mr. Holton,

and the fact that he is grouped with the other defendants (who appear to be still engaged with Click

Profit) makes clear that the TRO must be immediately vacated as to Mr. Holton because of this

factual error. *USA Fin., LLC*, 415 Fed. Appx. at 975 (injunctive relief may not be appropriate when

actions are unlikely to recur). Simply put, the FTC has failed to describe, with respect to Mr.

Holton, "the injury and state why it is irreparable," as required under Rule 65. Thus, the TRO must be dissolved.

      B.  <u>The FTC has failed to properly allege a likelihood of success justifying a preliminary injunction</u>.

Any *ex parte* TRO is premised on the Plaintiff's ability to obtain a preliminary injunction against the defendant, and this one is no different. However, the FTC cannot demonstrate that it is likely to obtain a preliminary injunction with respect to Mr. Holton.

The core conduct alleged is that of a scheme to solicit payments from consumers under the false pretense that Click Profit would create Amazon stores that would generate significant financial profits. *None* of the FTC's allegations suggest that Mr. Holton was part of this scheme. To the contrary, the Complaint and TRO Motion with accompanying exhibits demonstrate that Mr. Holton's role was limited. As described, there is not a single non-generic accusation that Mr. Holton had any part in Click Profit's allegedly false advertisements. *See Chiron Recovery Ctr., LLC v. United Healthcare Servs., Inc*., 2020 WL 3547047, at *5 (S.D. Fla. 2020) (dismissing a count as a shotgun pleading because the count, which was brought on behalf of nine individual defendants: "[did] not reference individual-specific transactions or individual-specific facts"; "[did] not address the individual plans governing each Individual Plaintiff's claim"; and did not clarify how each defendant broke the law) (*citing Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321–23 (11th Cir. 2015) ("Shotgun pleading exists when multiple parties or multiple claims for relief are merged into a single count.")). In fact, when the FTC argues that there was "evidence collected" demonstrating that the FTC can show each defendant's "participation" in the charged scheme, the FTC's TRO provides purported examples for the *other* defendants, but provides no examples for Mr. Holton. *See* Dkt. 5 at 29-30.

Instead, at most, Mr. Holton was a signatory on some accounts and operated a warehouse that shipped and received products. This is wholly insufficient to demonstrate a likelihood of success on the merits. *See Vylah Tec LLC*, 328 F. Supp. 3d at 1336-37 (although "Olga" was an employee at the company, had supervisory authority. was a signatory on certain bank accounts and handled the back-office aspects of the business, she did not "write or edit (advertising) scripts" and she did not discipline managers or sales employees; accordingly, Olga was not "substantially involved in the fraudulent operations").

Perhaps most troubling is the FTC's assertion in the Complaint that Mr. Holton is currently, and at "all times relevant to this Complaint," an "owner, officer, manager, director, or member of Click Profit, LLC, Express eCom LLC, and eCom Direct LLC." *See* Dkt. 1 ¶ 20; Dkt. 5 at 29. As described, Mr. Holton sold his ownership in Click Profit in October 2023, 18 months *before* the Complaint was filed. His only remaining connection to Click Profit, which ended in mid-2024, was to handle the returns from Amazon coming into his warehouse. This business divorce was a matter of public record. Click Profit's annual report, filed with the Florida Secretary State, listed Mr. Holton as a manager in the 2023 report (filed on January 10, 2023), but did *not* list him as a manager in the 2024 and 2025 reports. *See* Holton Decl. Ex. G at 8-10. The FTC should have known about this change in ownership.

That Mr. Holton sold his ownership stake in Click Profit LLC is critical to evaluating the FTC's likelihood of success on the merits in this case. The vast majority of the specific allegations in the Complaint are from activities in 2024, well *after* Mr. Holton left the company. Given that the FTC primarily sought a TRO (and preliminary injunction) on the sole basis of him being an "owner or manager" (*see* Dkt. 5 at 29), this alone dooms the FTC's case. In short, with no evidence that Mr. Holton participated in any of the alleged deceptive advertisements, had authority to

16

control the deceptive advertisements, or even knew about the at-issue practices, the FTC's chances for a preliminary injunction are slim. *See, e.g., Vylah Tec LLC*, 328 F. Supp. 3d at 1335 (parsing each defendant's activities separately and rejecting FTC request for asset freeze as to one defendant that was based almost entirely on him being a signatory on company bank accounts and merchant processing accounts).

Finally, as set forth above, eCom Direct LLC was Mr. Holton's personal LLC for a variety of business activities, and he used the corporate bank accounts to receive some of his distributions from Click Profit LLC. This LLC was dissolved at the end of 2024. And, Express eCom LLC had nothing to do with Click Profit LLC (it was a personal store for selling a variety of merchandise) and Mr. Holton parted ways with this business in February 2015. There are no ongoing entities under Mr. Holton's control that justify injunctive relief.

C. The FTC has failed to properly allege a likelihood of success justifying an asset freeze under the Business Opportunity and Impersonation Rules.

Even if the FTC did show some likelihood of success on its Section 5(a) claims (to be clear, it has not), such a violation, under *AMG Capital Management, LLC*, 593 U.S. 67, cannot justify an asset freeze. Rather, to obtain an asset freeze, the FTC must demonstrate that Mr. Holton's own conduct violated a specific rule such that an asset freeze is permissible under Section 19. Here, to obtain an asset freeze, the FTC cites the Business Opportunity Rule and the Impersonation Rule.

As the FTC's motion for a preliminary injunction explains, sellers of "business opportunities" are those in which a "seller solicits a prospective purchaser to enter into a new business"; the "prospective purchaser makes a required payment"; and the seller represents, "expressly or by implication" that it will "[p]rovide outlets, accounts, or customers … for the purchaser's goods or services." Here, according to the FTC:

Defendants solicit prospective purchasers to enter into a new business opening an e-commerce store-in exchange for a required payment, including an upfront fee of $50,000 or more, as well as additional, ongoing inventory payments. And Defendants offer to provide "outlets" in the form of e-commerce stores on Amazon, Walmart, TikTok, or eBay, where end users will purchase the consumers' goods. Id. § 437.1 (c)(3)(ii). As detailed below, the FTC is likely to prevail on its claims that Defendants violate the Rule by making false or unsubstantiated earnings claims and by failing to provide prospective purchasers with required written disclosures (Counts IV-VII).

Likewise, the FTC claims that the Defendants are violating the "Impersonation Rule" by materially misrepresenting an "affiliation with, including endorsement or sponsorship by," businesses such as Nike, Disney, Mattel, Dell and others. Dkt. 5 at 27. As described, there is no evidence that Mr. Holton solicited customers and made false representations to them, as required to find a violation of the Business Opportunity Rule, and there is similarly no evidence that Mr. Holton misrepresented an affiliation with any major brand. Thus, to the extent that a preliminary injunction *is* imposed, an asset freeze is inappropriate.

> D. <u>The FTC has failed to properly define the scope of the requested asset freeze.</u>

As set forth in *Vylah Tec LLC*, 328 F. Supp. 3d at 1336-37, even if the FTC is entitled to some form of asset freeze (once again, it is not), the scope of the asset freeze—all of Mr. Holton's assets—is unjustified. *See* Dkt. 15 at 10-11.

The assets that the FTC can freeze must be those gained from "allegedly unlawful practices." *Vylah Tec LLC*., 727 Fed. Appx. at 1002. Further, this Court must make "factual findings" making clear what specific assets, and what amount, were "obtained through wrongdoing." Here, the FTC has not attempted to show that *all* of Mr. Holton's assets were obtained through unlawful activity, and therefore the TRO should be lifted for this reason alone. Nor has the FTC attempted to show any specific amounts gained by Mr. Holton that stem from his knowing participation in unlawful conduct. Again, Mr. Holton sold his Click Profit share to

defendants, worked as a Click Profit employee, received some Click Profit distributions, and engaged as an independent contractor to shutter the warehouse. The FTC has not demonstrated that *any* of this money was obtained through wrongdoing, nor could it.

      E.   <u>The balance of the equities does not favor either a preliminary injunction or asset freeze.</u>

The balance of equities does not justify a preliminary injunction or, as part of the injunction, an asset freeze.

Mr. Holton is not part of any of the corporate entities alleged to be at issue. He sold his stake in Click Profit 18 months ago; he shuttered eCom Direct at the end of 2024; and, he disengaged from Express eCom in February 2025 after losing money. Given that Mr. Holton voluntarily disengaged from all this activity *prior* to the FTC surfacing in this matter, there clearly is no "reasonable likelihood of further violations in the future" that could justify injunctive relief. *See USA Fin., LLC*, 415 Fed. Appx. at 975; *see also FTC v. Inbound Call Experts*, 14-81395-CV, 2014 WL 8105107 (S.D.F.L. Dec. 23, 2014) (FTC may seek preliminary injunction only when defendant is "violating or about to violate" the law).

Moreover, there is no traditional equity that weighs in favor of a preliminary injunction (or temporary restraining order). Because of Mr. Holton's voluntary cessation of any association with Click Profit, the public does not need protection. And because the FTC has failed to calculate how much Mr. Holton gained from any unlawful activities and further failed to link his earnings to unlawful activities, there has been no showing that the public would fail to receive disgorgement after a full trial on the merits. Finally, the FTC has also not even attempted to show asset dissipation for Mr. Holton, thereby eliminating any need for an accompanying asset freeze.

In sum, the FTC has failed to meet its burden justifying a TRO in this case, let alone an *ex parte* TRO. The FTC further fails to demonstrate any cognizable need for a preliminary injunction.

Accordingly, the TRO issued against Mr. Holton, which has caused him considerable harm due to the total freeze of his assets, must be dissolved.

Dated: March 17, 2025

Respectfully submitted,

By: */s/ Constantine P. Economides*
Constantine P. Economides, No. FL118177
DYNAMIS LLP
1111 Brickell Ave., 10th Fl.
Miami, FL 33131
Telephone: 305.985.2959
Email: ceconomides@dynamisllp.com

*Counsel for Defendant*

Eric S. Rosen (pro hac vice)
DYNAMIS LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
Email: erosen@dynamisllp.com

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I certify that on March 17, 2025, a true and correct copy of the above motion and brief was filed with the Court's CM/ECF system, which has generated and delivered electronic notices of filing to all counsel of record who have consented to electronic service. Further, Mr. Holton has asked the FTC to dissolve the TRO, but the FTC has declined to do so at this time.

*/s/  Constantine P. Economides*
Constantine P. Economides

**APPENDIX A**

| Exhibit | Source of Complaint | Complaint Name/Number | Date | References to Named Defendant(s) |
|---|---|---|---|---|
| PX1 Attachment GG | Sentinel | 181968532 | 01/06/2025 | Jason Masri<br>Click Profit Distribution LLC |
| PX1 Attachment GG | Sentinel | 181314244 | 12/12/2024 | Automation Industries<br>Click Profit LLC |
| PX1 Attachment GG | Sentinel | 178121249 | 09/25/2024 | Click Profit LLC<br>Craig Emslie |
| PX1 Attachment GG | Sentinel | 175483539 | 07/22/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 175481222 | 07/23/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 175480747 | 07/22/2024 | Automation Industries |
| PX1 Attachment GG | Sentinel | 174960474 | 07/08/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 174960393 | 07/08/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 174894105 | 07/07/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 174879068 | 07/05/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 174643973 | 06/28/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 174567657 | 06/28/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 174556305 | 06/27/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 174254236 | 06/18/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 171352193 | 03/29/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 169102430 | 01/31/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 169051318 | 01/30/2024 | Click Profit LLC<br>Craig Emslie |
| PX1 Attachment GG | Sentinel | 169039950 | 01/30/2024 | Craig Emslie<br>Click Profit LLC |

| PX1 Attachment GG | Sentinel | 168818103 | 01/25/2024 | Automation Industries<br>Jason Masri |
|---|---|---|---|---|
| PX1 Attachment GG | Sentinel | 168458777 | 01/12/2024 | Click Profit LLC<br>Automation Industries |
| PX1 Attachment GG | Sentinel | 167473982 | 12/04/2023 | Click Profit LLC |
| PX1 Attachment GG | Sentinel | 167026572 | 11/29/2023 | Jason Masri<br>Automation Industries |
| PX1 Attachment GG | Sentinel | 156048045 | 02/18/2023 | Automation Industries<br>Jason Masri |
| PX1 Attachment GG | Sentinel | 152996699 | 10/04/2022 | Click Profit LLC<br>Patrick McGeoghean |
| PX1 Attachment GG | Sentinel | 175310046 | 07/18/2024 | Jason Masri |
| PX1 Attachment HH | BBB Boston | 20521216 | 08/25/2023 | Click Profit LLC |
| PX1 Attachment HH | BBB Boston | 20463992 | 08/13/2023 | Craig Emslie<br>Click Profit LLC |
| PX1 Attachment HH | BBB Boston | 21221722 | 01/30/2024 | Click Profit LLC |
| PX1 Attachment HH | BBB Boston | 22484320 | 10/28/2024 | Click Profit LLC<br>Jason Masri |
| PX1 Attachment HH | BBB Boston | 5467669 | 11/07/2023 | Click Profit LLC |
| PX1 Attachment II | BBB West Florida | 21196770 | 01/29/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment II | BBB West Florida | 21430037 | 03/13/2024 | Automation Industries<br>Jason Masri<br>Click Profit LLC |
| PX1 Attachment II | BBB West Florida | 21718094 | 05/15/2024 | Automation Industries<br>Jason Masri |
| PX1 Attachment II | BBB West Florida | 21726099 | 05/17/2024 | Automation Industries |
| PX1 Attachment II | BBB West Florida | 21708305 | 06/04/2024 | Automation Industries<br>Click Profit LLC<br>Craig Emslie<br>Jason Masri |
| PX1 Attachment II | BBB West Florida | 21957819 | 07/16/2024 | Automation Industries<br>Click Profit LLC |
| PX1 Attachment II | BBB West Florida | 22138590 | 08/13/2024 | Automation Industries<br>Click Profit LLC |

| PX1 Attachment II | BBB West Florida | 22258736 | 09/09/2024 | Automation Industries |
| PX1 Attachment II | BBB West Florida | 22474777 | 10/25/2024 | Automation Industries Jason Masri |
| PX1 Attachment II | BBB West Florida | 20401144 | 07/31/2023 | Automation Industries Jason Masri |
| PX5 (incl. Attachments) | FTC Declaration | David Blevins | 02/13/2025 | Click Profit LLC Craig Emslie |
| PX6 (incl. Attachments) | FTC Declaration | Patricia Gase | 02/17/2025 | Automation Industries Click Profit Distribution LLC Click Profit LLC Jason Masri Craig Emslie |