UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:25-CV-20973-LEIBOWITZ/TORRES

FEDERAL TRADE COMMISSION,

    *Plaintiff*,

v.

CLICK PROFIT, LLC, *et al.*,

    *Defendants*.

REPLY IN SUPPORT OF EXPEDITED MOTION

**<u>DEFENDANT WILLIAM HOLTON'S REPLY FILED IN SUPPORT OF HIS MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER</u>**

Defendant William Holton respectfully files this reply in response to the FTC's opposition to his motion to dissolve the Temporary Restraining Order, filed at Dkt. 58 ("Opposition"). For the reasons set forth below, the FTC's Opposition, which attaches more than 300 pages of exhibits (never before provided to counsel), is misleading, conflates different entities, and attempts to hold Holton accountable for the actions of others. Put simply, the Opposition further illustrates why the TRO should be dissolved so that Mr. Holton can have a chance to fight this case on its merits.

    **A.**    **The Alleged Conduct**

The FTC's allegations in the Complaint are critical to the Court's analysis. As described by the FTC, this case is about "Click Profit," which is a business that sold "business opportunities to customers throughout the United States." Dkt. 1 ¶23. In exchange for "initial payments of at least $45,000," Click Profit told customers that they would set up e-commerce stores at Amazon or Walmart, manage the stores' logistics (including product selection, shipping and customer service), and then split the profits from the stores with the customers.

1

The fraud at issue here consists of "deceptive claims" in advertisements designed to lure customers to Click Profit. *Id*. ¶27. Defendants, according to the FTC, rely on three "false" claims to attract customers: 1) that Click Profit consumers will earn substantial income, 2) that Defendants have negotiated partnerships with entities such as Nike, and 3) that Defendants have proprietary technology to select the products for the stores that they manage, ensuring demand and profitability. ¶28. The Complaint cites different advertisements, reflecting the FTC's focus on alleged misrepresentations to consumers about prospective profits. . *Id*. ¶¶30-41. The FTC does not allege that simply operating Amazon stores for customers is illegal; rather, the FTC's claim is that the specific representations made by the defendants to customers is at issue.

B.      **The FTC's Exhibits Fail to Demonstrate Actionable Wrongdoing by Mr. Holton**

The FTC does not dispute that Mr. Holton sold his portion of Click Profit in October 2023, thereby rendering false the FTC's allegations that Mr. Holton was an "owner, manager, director, or member" of Click Profit. Dkt. 1 ¶20. Rather, the Opposition hinges on a number of exhibits— none of which were produced to Mr. Holton before *today*—that purport to show that he was (and still is) an active participant in Click Profit's alleged fraud. But these exhibits demonstrate the weakness of the FTC's case and confirm that the TRO should be dissolved.

*First*, the FTC claims that Defendants held out Holton and others as having a "huge vision for the future and are the driving force behind changing the entire industry." Opp. at 6. Even if Defendant made such representations, there is nothing fraudulent. Moreover, in support of this assertion, the Opposition relies upon Attachment Q to the McKenney Affidavit ("Attachments"). *See* Dkt. 58-1 at 294-301. Attachment Q consists of sales scripts obtained from Click Profit's Google drive. Attachments at ¶¶18-19. The McKenney Declaration does not allege that Holton had access or control over this Google drive or that, he reviewed, or even saw, the scripts.

*Second*, the FTC argues that Holton "regularly reviewed Click Profit's sales materials." Opp. at 6-7. In support of that assertion, the FTC claims that Emslie, at one point, sent Holton an email with the subject line "Pitch Deck." Opp. at 6-7. This Pitch Deck pertained to Walmart customer stores. *Id*. In support of this, the FTC cites to the McKenney Attachment J. Attachments at at 247-266. But the email was sent on June 11, 2021 to Holton's brand-new email account at Clickprofit—he had just joined the Company. There are no allegations Holton read or reviewed this presentation, knew anything in it was false (the other defendants were already engaged in Walmart sales), edited the presentation, or even responded back to Emslie. Far from showing that he "regularly reviewed" Click Profit's "sales materials," the email and attachment do not even show that he "reviewed" anything. The FTC's evidence is hollow and the argument is wrong.

*Third*, the FTC asserts that Holton has "also written, reviewed and edited Click Profit sales scripts." Opp. at 7. The Opposition cites to Attachments G, H and I of the McKenney Declaration. *See* Attachments at 241-246. Again, this was in June 2021, shortly after Holton joined ClickProfit. But more importantly, the Declaration fails to attach any of the "scripts" that Holton allegedly edited, wrote, or reviewed. It is not illegal to have scripts or to advertise products. The illegality, according to the FTC, arose from the alleged false representations to consumers. Without evidence demonstrating Holton's participation in those acts, these "scripts" are irrelevant. There are not even allegations that these scripts were ever used to communicate with customers.

*Fourth*, the FTC cites to a "months long" text message chain that allegedly shows that Holton was aware of company sales tactics. Opp. at 7. The FTC points to Attachment C in Attachments at 182-210 in support. These messages were from May 24, 2021 to August 12, 2021, just when Holton was being introduced to the business. Craig provided Holton with a "sales template," but again, there is nothing describing what was *in* this sales template, which is all that

3

matters. Attachments at 201. A "sales template" is not illegal. There are also very few messages in Attachment C sent by Holton over the course of this multi-month chat, indicating his complete lack of interest in what was transpiring.

*Fifth*, the FTC's citations to the McKenney Attachment K and M for the proposition that Holton was involved in customer sales are likewise unavailing. *See* Opp. at p. 7 fn. 14. Attachment K, a Zoom video, depicted a meeting with a company called "Client Accelerators," an advertising company. The only reason Holton was on the Zoom (which showed no malfeasance) was because he had the connection with that company. And the Exhibit M "Zoom invitations" shows Holton logging onto a March 2, 2022 meeting on "Closing" at multiple times *in 2023*. *See* Attachments at 272-276. It is unclear why this was happening—was there a different meeting or did Holton simply click on an old link—and the FTC provides no information as to what these "closers calls" were about or whether there were illegal activities discussed on these calls.

*Sixth*, the FTC is mistaken in their claim that Holton communicated "directly with" customers regarding sales. *See* Opp. at 7-8. The FTC cites to Attachment F, which is an email chain that Holton is *not* on. Attachments at 237-240. Nonetheless, the FTC claims it pertains to Holton because the customer refers to an "original meeting with you and Bill" as well as a lack of "point blank honesty" from Craig and Bill. *Id.* at 239. But the customer was obviously referring to *William Aliaga*, a sales representative for Click Profit, and not William Holton (who was not a sales representative). The FTC just did not do their diligence.

Similarly, the FTC's reliance on Attachment P (Dkt. 58-1 at 286) is misplaced. Opp. at 8. This is a lengthy email chain between "Chris," a customer, and Jeff Stepanek in January and February 2023. Emslie then, on February 1, 2023, forwarded the customer's email to Holton, who does not respond. *Id*. It is unclear what the FTC is attempting to prove here, given the lack of

4

anything fraudulent (the customer's store had been suspended), and Holton's lack of response, but the email chain was most likely sent to Holton because he was in charge of providing products for customers' stores. It would have been important for him to know that a store had been suspended.

Indeed, to the extent that Holton had *any* communications with customers, it was about operations concerning their stores. Opp. at 8. In Attachment L (Attachments at 270) Bill was asked to "take lead" on getting the store "up and running." In Attachment E (Attachments at 234), Holton was allegedly tasked with applying for a customers' EIN (he is not on the email). Again, this is not illegal. And Attachment D is a group text with a Certified Public Accountant about the tax implications for setting up stores. Attachments at 232. Attachment O, the only email where Holton writes to a customer, shows Holton helping a customer with a unsuspended Amazon store. Attachments at 281-82. This issue is detailed in Holton's own declaration where he talked about how Amazon improperly suspended stores. Dkt. 46-1 ¶¶15-16. None of these communications evidence or even relate to the core conduct alleged in the Complaint.

*Seventh*, the FTC claims that Holton was involved in "other misconduct related to Click Profit" (Dkt. 58 at 9), but the Attachments cited demonstrate otherwise. Attachment B is a lengthy text message chain called "Amazon Reviews," featuring Emslie, an individual named "Rabi," and, at times, Holton. *See* Attachments at 108 to 181. As the messages indicate, Bill did send a few messages related to purchasing Amazon reviews in May and early June 2023. But these reviews have *nothing* to do with a "business opportunity," which is the fraud alleged in the Complaint. The Complaint does not allege misconduct as to purchased reviews on Amazon. Moreover, these reviews were about boosting sales for certain products to *help* customers sell products. In addition, the reviews purchased after October 2023 did not concern Click Profit at all. Rather, these reviews were part of Express eCom, which, as Holton's declaration explains, was his own store that he

5

operated with Craig. Dkt. 46-1 ¶28. This store was not part of Click Profit, and the FTC has not shown otherwise.

Further, Attachment N, contrary to the FTC's assertion (Opp. at 9), does not show that Holton "knew about" Click Profit's "suppression practices." Holton was Bcc'd on a May 5, 2023 email sent by someone else to a customer where that person asked the customer to take down a review, which concerned a store suspended by Amazon. *See* Attachments at 278. There is nothing in the email indicating that this request was unlawful. And there is nothing in the Attachment indicating that Holton read the email, responded to the email, or even knew about the conduct.

*Eighth*, the Attachments cited by the FTC for the proposition that Holton was not "purely and exclusively" responsible for "clearing out Click Profit's warehouse" between October 2023 and June 2024" reflect another error by the FTC. The exhibits relied upon by the FTC— Attachment A (61-71), Attachment B (61-74) and Attachment R—concern the activities of *Express eCom*, an entirely separate business run by Emslie and Holton together. Dkt. 46-1 ¶28. Holton explained this fact in his Declaration, and the FTC has produced no evidence showing otherwise. As Holton explained, Express eCom sold "pimple patches," meat slicers and cold plunge tubs." *Id*. The Attachments cited by the FTC show that the conversations relied upon by the FTC concerned meat slicers, pimple patches, and cold plunge tubs. *See* Attachments at 31, 33, 35, 39, 47, 64, 302. The FTC has improperly conflated the businesses together to falsely imply that Holton's Declaration was untrue.

Finally, the FTC cites a January 2025 series of text messages where Emslie asks Holton to delete Slack Messages. *See* Opp. at 10. The FTC argues: "It is inconceivable that someone who actively deleted messages that would cause Defendants to be "f*cked" if discovered "by the FTC" did not directly participate in, know about, and have authority to control the underlying practices."

6

*Id*. at 11. This argument fails. The evidence showing that Holton participated in, knew about, and had the "authority to control" the fraud" would be *direct* evidence, contemporaneous with the time in which Holton was involved in Click Profit, showing his knowledge, participation in and authority to control. This message chain occurred in January 2025. By then, Holton had been separated from Click Profit for *15 months*.[1] It was his former partners who made the request to delete messages (not him). As the cited messages make clear, Emslie was annoying Holton with his requests, and when Emslie talked about an "FTC audit" for a business Holton had long since left, Holton did *not* agree with Emslie's assessment. *Id*. Rather, he simply responded "I'll check again when I get home." Attachments at 74. Far from showing agreement with Emslie, the tone of his response indicates that he was placating Emslie because, as the texts demonstrate, he continued to do business with him at Express eCom. *See* Attachments at 74-86.

In sum, the FTC's more than 300 pages of Attachments, provided just one day before the hearing, do not state what the FTC claims that they state. Rather, it is clear that the FTC's entire impeachment of Holton's declaration involves one email he sent to a customer (an email sent to help with a suspended store) and a January 2025 text message sent by another defendant, 15 months after Holton's departure from Click Profit, that Holton did not even agree with.

C. **The FTC's Remaining Arguments are Meritless**

The FTC wants to end this case before it has even started. The FTC refuses to release assets for attorneys' fees or even to allow Mr. Holton to live. The FTC will not even tell Mr. Holten's counsel how much money they seek from Mr. Holton. The FTC's strategy is straightforward—

---

[1] It is unclear how the statement by Emslie concerning the FTC could be admissible against Holton. By January 2025, the conspiracy (to the extent that it ever existed) was long since over. Holton had terminated his position with Click Profit 15 months earlier. *See* Fed. R. Civ. Pro 801(c)(2)(E) (coconspirator statements must be made "during and in furtherance of the conspiracy"). Thus, to the extent that it is admissible, it is admissible against Emslie alone.

7

starve Mr. Holton of resources with the expectation that he will fold, allowing the FTC to prevail in their "litigation". This tactic is not right, and it is not supported by the evidence.

As an initial matter, the FTC's argument that Mr. Holton must show a "change in circumstances" to dissolve an *ex parte* TRO is wrong. The sole case cited, *Absolute Activist Value Master Fund Limited v. Devine*, 2017 WL 3188502, *3 (M.D. Fl. 2017) concerns a motion "to dissolve a preliminary injunction," not an *ex parte* TRO. Fed. R. Civ. Pro. 65(b)(4) makes clear that on "2 days' notice to the party who obtained the order without notice," the "adverse party may appear and move to dissolve or modify the order." Given how extreme an *ex parte* TRO is—particularly one freezing the entirety of a person's assets—the Rule makes clear that no reason is required, let alone a "change in circumstances," to move to dissolve an *ex parte* TRO. The FTC's misstatement of such a basic principle betrays the weakness of the FTC's arguments.

The FTC's more substantive arguments are equally lacking. *First*, although the arguments on the "merits" and the FTC's likelihood of success are addressed above,[2] it is important to point out the FTC's recognition that the information contained in the FTC's Complaint and motion for a TRO was not accurate. The FTC acknowledges that Holton sold his interest in Click Profit back in October 2023, a critical fact left out of the Complaint and other filings with the Court. Opp. at 13. For this reason, this Court should give no deference to the FTC's argument that this Court "already has found that the asset freeze and receivership were proper and necessary …". Opp. at 14. An asset freeze based on inaccurate information is not a proper asset freeze.[3]

---

[2] As described, in order to find an individual liable for FTC Act violations, the FTC must prove that the individual "participated directly in the [deceptive] practices or had authority to control them." *FTC v. IAB Marketing*, 746 F.3d 1228, 1233 (11th Cir. 2014).

[3] In criminal law, courts evaluate the proprietary of a search warrant that contains false or misleading information based on the standard enunciated in *Franks v. Delaware*, 438 U.S. 154 (1978), by which the false information is stripped out and the court determines whether the

But the FTC contends that new "facts" discovered after the TRO was signed can be bootstrapped to justify a prior issued TRO. The FTC does not cite a single case allowing the FTC to rely on new "evidence" to justify a previously awarded *ex parte* TRO issued on improper grounds. Search warrants do not become valid based on evidence found during the search, and *ex parte* TROs do not become sufficient based on "new" evidence discovered after the fact. To the extent that the FTC wishes to introduce any "new" evidence, it can do so at the preliminary injunction hearing on April 9, 2025.

*Second*, and importantly, the FTC ignores the distinction between violations of the FTC Act, which allows for injunctive relief but not asset freezes, and violations of the Business Opportunity Rule and Impersonation Rule, that allow for asset freezes. To the extent that Mr. Holton engaged in deceptive conduct (which we dispute), the FTC has made no showing that he knowingly participated in violations of either of these rules.

*Third*, the FTC appears to argue that a freeze of all of Holton's assets is necessary because Holton could potentially be liable for all products sold (regardless of whether he participated or not, and regardless of whether he gained or not) and that this Court need not make factual findings concerning what Holton gained from his own unlawful conduct. *See* Opp. at 15-16. But the FTC cites no cases for this proposition. To the contrary, given that the FTC admits it is no longer seeking disgorgement under Section 13(b), the Court must calculate potential monetary relief available under Section 19(b) of the FTC Act. This section permits the FTC to seek monetary relief only as "necessary to redress injury to consumers or other persons, partnerships, and corporations resulting

---

remaining information would have provided probable cause for the warrant. The same standard should be applied here—the false information concerning Holton's current and remaining participation in Click Profit should be stripped out and the TRO re-evaluated in that light. If the Court does that, it is clear that there is no evidence justifying an *ex parte* TRO.

9

from [a] rule violation. 15 U.S.C. § 57b(b). This authority is narrow. *See, e.g., FTC v. Noland*, 2021 WL 5493443, at *6 (D. Ariz. 2021) (explaining Section 19(b)'s "narrow focus on providing damages awards 'necessary to redress injury'").

Indeed, as the district court explained in *FTC v. Zurixx, LLC*, 2021 WL 5179139, at *7 (D. Utah 2021), the change "from the previous gross revenue damages under Section 13(b) to the individualized consumer redress damages under Section 19 is a significant change in not only the amount of damages but the type of evidence needed to demonstrate those damages." The *Zurixx* court, in a lengthy explanation of Section 19(a) damages, ruled that the FTC must show the "extent to which each consumer was harmed" from the rule violations and not "merely" rely on "gross revenues." *Id.* at *6. The court rejected the FTC's argument that the "total amount of telesales in the statutory period" equated to "consumer injury," and as a result, the court unfroze assets for attorneys' fees to "assist in their defense of the case." Simply put, the FTC must demonstrate the extent of consumer injury directly tied to the rules' violations, and the FTC has not even attempted to do so. *See FTC v. Vylah Tec LLC*, 727 F. App'x 998, 1002 (11th Cir. 2018) (emphasizing that a district court must make "sufficient factual findings to support freezing these assets"). Accordingly, the asset freeze must be lifted for this reason too.[4]

For all these reasons, the FTC's Opposition should be rejected, and the motion to dissolve the TRO granted.

---

[4] The FTC's reliance on *FTC v. Credit Bureau Center, LLC*, 81 F. 4th 710, 718 (7th Cir. 2023) is misplaced. While Section 19(a) authorizes the refund of money, any refund must be "necessary to redress injury to consumers." Thus, the burden first is on the FTC to demonstrate the consumers' total injury, and then, refunds could be appropriate.

Dated: March 26, 2025

    Respectfully submitted,

By: */s/ Constantine P. Economides*
Constantine P. Economides, No. FL118177
DYNAMIS LLP
1111 Brickell Ave., 10th Fl.
Miami, FL 33131
Telephone: 305.985.2959
Email: ceconomides@dynamisllp.com


Eric S. Rosen (pro hac vice)
DYNAMIS LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
Email: erosen@dynamisllp.com

*Counsel for Defendants William Holton and eCom Direct LLC*

## CERTIFICATE OF SERVICE

I certify that on March 26, 2025, a true and correct copy of the above reply brief was filed with the Court's CM/ECF system, which has generated and delivered electronic notices of filing to all counsel of record who have consented to electronic service.

*/s/ Constantine P. Economides*
Constantine P. Economides
